Esperanza Cervantes Anderson | SBN 197953
**LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
1037 North Allen Avenue
Pasadena, California 91104
Tel.:   (626) 219-6773
Fax:   (626) 389-8911

Attorney for Plaintiff Relator
FRANK ADOMITIS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u> FRANK ADOMITIS, an individual, <br><br> Relator, <br><br> v. <br><br> SAN BERNARDINO MOUNTAINS COMMUNITY HOSPITAL DISTRICT; DOES 1 through 20, inclusive, <br><br> Defendants. | Case No. Case No.: 5:17-cv-00002-JGB-KK <br> (Hon. Jesus G. Bernal) <br><br> **FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT** (31 U.S.C. §§ 3729 et seq.) <br><br> **JURY TRIAL DEMANDED** <br><br> **(FILED IN CAMERA AND UNDER SEAL, AS REQUIRED BY 31 U.S.C. § 3730 (a)(2))** |

**NATURE OF THE ACTION**

1.     This is a civil action brought by the United States, as Plaintiff, against Defendants San Bernardino Mountains Community Hospital District (the "Hospital") and DOES 1-10 for Medicare fraud involving millions of dollars and both factually and legally false claims, lasting over the course of more than a decade, and continuing at present. This suit seeks damages, civil money penalties, and other relief under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended by the False Claims Act Amendments of 1986, the Fraud Enforcement and Recovery Act

1  of 2009, Pub. L. 111-21 ("FERA"), and the Patient Protection and Affordable Care
2  Act of 2010, Pub. L. 111-148.

3      2.    The FCA was originally enacted during the Civil War to address fraud
4  against the Government. Congress substantially amended the Act in 1986 to enhance
5  the Government's ability to recover losses sustained as a result of fraud against the
6  United States after finding that fraud in federal programs was pervasive and that the
7  Act, which Congress characterized as the primary tool for combating Government
8  fraud, was in need of modernization. Congress intended the amendments to create
9  incentives for individuals with knowledge of fraud against the Government to
10  disclose information without fear of reprisals or Government inaction, and to
11  encourage the private bar to commit legal resources to prosecuting fraud on the
12  Government's behalf.

13      3.    The FCA provides that any person who presents or causes to be
14  presented false or fraudulent claims for payment or approval to the United States
15  Government, or knowingly makes, uses, causes to be made or used false records and
16  statements to induce the United States to pay or prove false and fraudulent claims,
17  is liable for a civil penalty of up to $11,000 for each such claim, plus three times the
18  amount of damages sustained by the federal Government.

19      4.    The FCA allows any person having information about false or
20  fraudulent claims to bring an action on behalf of the Government, and to share in
21  any recovery. The FCA requires that the complaint be filed under seal for a minimum
22  of 60 days (without service on the Defendants during that time) to enable the United
23  States to: (a) conduct its own investigation without the Defendants' knowledge, and
24  (b) determine whether to join the action.

25      5.    Based on the FCA, *qui tam* plaintiff and relator Frank Adomitis seeks
26  to recover all available damages, civil penalties, and other relief for the federal
27  violations alleged herein.

28

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

**PARTIES**

6.      Plaintiffs are the United States of America (United States or Government) and the relator, Frank Adomitis. The United States files this First Amended Complaint on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), on behalf of the Medicare program.

7.      Plaintiff/relator Frank Adomitis ("Relator") is an individual residing in the County of San Bernardino, State of California. From July 1, 2007 through November 24, 2008, Adomitis worked as the Chief Financial Officer of the Hospital.

8.      Defendant San Bernardino Mountains Community Hospital District (the "Hospital") is a 37-bed facility located at 9101 Hospital Rd., POB 70, Lake Arrowhead, CA   92352. The Hospital is operated under the San Bernardino Mountains Community Healthcare District and has operated from 1947 to the present.

9.      Relator is ignorant of the true names and capacities, whether individual, corporate, or associate, of those defendants fictitiously sued as Does 1 through 20 inclusive and so Relator sues them by these fictitious names.  Relator is informed and believes that each of the DOE defendants is in some manner responsible for the conduct alleged herein. Upon discovering the true names and capacities of these fictitiously named Defendants, Relator will amend this complaint to show the true names and capacities of these fictitiously named defendants.

10.      Unless otherwise alleged in this complaint, Relator is informed, and on the basis of that information and belief alleges, that at all times herein mentioned, each of the remaining codefendants, in doing the things hereinafter alleged, were acting within the course, scope, and under the authority of their agency, employment, or representative capacity, with the consent of her/his/its codefendants.

**JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 31 U.S.C. § 3730. The First Amended Complaint is not based upon allegations or transactions that have been publicly disclosed under 31 U.S.C. § 3730(e). In addition, the Relator has direct and independent knowledge of the information on which the allegations and transactions are based and voluntarily provided the information to the Government before filing this action.

12.    Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §§ 139l(b) and 1395(a) and 31 U.S.C. § 3732(a), as the Defendants are found in, have or have had an agent or agents, have or have had contacts, and transact or have transacted business in this district.

**CRITICAL ACCESS HOSPITAL ("CAH") FRAMEWORK**

13.    The United States, through HHS and its component agency, CMS, administers the Medicare program, including payments made on a beneficiary's behalf for inpatient and outpatient hospital services provided by a hospital that has entered into an agreement with the Secretary to participate in the Medicare program. Section 1814(1) of the Social Security Act (42 U.S.C. § 1395f(1)) provides for payment of Part A, inpatient CAH services, and Section 1834(g) (42 U.S.C.§ 1395m(g)) provides for payment of Part B, outpatient CAH Services. CMS pays Medicare bills, also called claims, received from hospitals such as the Hospital, and all such claims are paid with federal funds.

14.    In 1997, the Balanced Budget Act ("BBA") created the CAH certification to ensure that hospital care is accessible to beneficiaries in rural communities.  CAH hospitals are typically small health care organizations with no more than 25 hospital beds that can be used for either inpatient or "swing bed"

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

First Amended Complaint for Damages / Demand For Jury

1  services,[1] and are generally located in rural communities with a limited employment
2  and economic base.  In the United States, there are approximately 1,300 to 1,400
3  CAHs.[2]

4       15.    CAHs are reimbursed differently by Medicare than other acute care
5  hospitals. CAHs receive federal reimbursement incentives designed to attract
6  hospital providers to communities that would otherwise have difficulty receiving
7  hospital care.  Specifically, CAHs receive 101 percent (101%) of Medicare's share
8  of their reasonable and allowable costs for outpatient, inpatient, laboratory, and
9  ambulance services, as well as for "swing bed" services). *See* 42 C.F.R. §§ 413.70,
10  413.114.  In contrast, traditional hospital facilities are paid under Prospective
11  Payment Systems through which Medicare reimbursement is fixed and capped.
12  Medicare generally pays for the same medical services provided by a CAH as by
13  other acute care hospitals, but CAH payments are based on each CAH's reasonable
14  and allowable costs and the share of those costs allocated to Medicare patients. Thus,
15  as the costs increase, the Medicare reimbursement rates to CAHs also increase and,
16  as these rates increase, so too do the Medicare reimbursements.

17       16.    The Medicare reimbursement rates for CAHs are computed for
18  inpatient services as an average cost per day based on historical data multiplied by
19  101% and paid on an interim basis.  The Medicare reimbursement rates for CAHs
20  are computed for outpatient services by multiplying the billed charge of each claim
21  by the hospital's cost-to-charge ratio and then adding 1 percent (1%) to that amount.

22       17.    Hospitals must meet specific requirements in order to qualify for the
23  CAH certification and receive the favorable Medicare reimbursements described

24

25  [1]   "Swing beds" is a reimbursement term that reflects a CAH's ability to use its beds
26  interchangeably for either acute-care or post-acute skilled nursing care.  They are designed to
   offer care to patients who no longer need acute care, but do require additional inpatient services.
27  *See* 42 C.F.R. § 485.620.

28  [2]   *See also* OIG Report, *infra.*

First Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

1    above. Specifically, hospitals must meet the requirements set forth in the CAH

2    Conditions of Participation (which lay out health, safety, and location-related

3    requirements) to receive the CAH certification.

4       18. Because the intent of the CAH certification is to ensure access to care

5    in rural communities, CAHs must meet two location-related requirements. 42

6    U.S.C. §1396i-4(c)(2). CAHs **must** be located at least a minimum distance from

7    hospitals (including acute-care, psychiatric, rehabilitation, long-term, and

8    children's hospitals) and other CAHs, and they **must** be located in rural areas.[3]

9       19. **Distance Requirement.** Hospitals that wish to obtain the CAH

10    certification can meet the distance requirement in one of two ways: (1) by being

11    located more than a 35-mile drive from a hospital or another CAH or (2) by being

12    located more than a 15-mile drive from a hospital or another CAH in areas of

13    mountainous terrain[4] or areas where only secondary roads[5] are available. 42 CFR

14    §485.610(c).

15       20. **Rural requirement.** Hospitals that wish to obtain the CAH

16    certification can meet the rural requirement by being located either in rural areas or

17    in areas that are treated as rural. 42 CFR §485.610(b). CMS uses a formula based

18    on multiple criteria to determine rural status. Examples of these criteria include

19

20    [3] Department of Health and Human Services, Office of Inspector General,OEI- 05-12-00080,

21    *Most Critical Access Hospitals Would Not Meet the Location Requirements if Required to Re-Enroll in Medicare,* (August 2013*)* (Retrieved from https://oig.hhs.gov/oei/reports/oei-05-12-00080.pdf on November 3, 2017*).*

22    [4] Prior to 2013, CMS defined "mountainous terrain" as areas identified as such on any official

23    maps or other documents published by the State agency responsible for highways in the State (typically a Department of Transportation or Highways) or by USGS. In April 2013, CMS published a uniform definition of "mountainous terrain" which States are to use when certifying

24    hospitals as CAHs. According to this definition, roads that travel through mountainous terrain must be located in a mountain range and meet one of two additional requirements related to ease

25    of travel or effort required to construct the roads. *See also* OIG Report, *supra.*

26    [5] CMS defines "secondary roads" as roads that are not primary roads. Primary roads include Federal highways (including interstate highways), state highways with two or more lanes in one direction, and roads that—in accordance with U.S. Geological Survey (USGS) standards—are

27    shown on maps as primary highways. Secondary roads typically are one-lane State highways and all other local roads. 42 CFR §485.610(c). *See also* OIG Report, *supra.*

28

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

First Amended Complaint for Damages / Demand For Jury

1    whether a CAH is located outside a metropolitan statistical area (MSA), located
2    inside a rural census tract, or located in an area designated as rural by State law or
3    regulation.[6]

4         21.    **Additional CAH requirements.** To be certified as CAHs, facilities
5    must meet additional requirements beyond the location requirements described
6    above.  For example, CAHs cannot have more than 25 beds that are used for acute
7    care or "swing-bed" patients (42 CFR §485.620(a)), they must offer 24-hour
8    emergency services (42 CFR §485.618(a)), and they must achieve an annual
9    average length of stay for patients that does not exceed 96 hours.42 CFR §620(b).

10        22.    **Necessary Provider CAHs.**  Prior to January 1, 2006, states had
11   discretion to designate hospitals that did not meet the distance requirement as
12   "necessary provider" (NP) CAHs.  NP CAHs had to comply with all of the CAH
13   Conditions of Participation at the time of their certification.

14        23.    CAHs that were designated NP CAHs prior to January 1, 2006 are
15   permanently exempt from meeting the distance requirement, unless they relocate.
16   Effective January 1, 2006, the Medicare Prescription Drug, Improvement, and
17   Modernization Act prohibited the creation of new NP CAHs, but allowed existing
18   NP CAHs to retain their NP designations indefinitely, as long as they continue to
19   meet all other CAH requirements.

20        24.    In August 2013, the Department of Health and Human Services Office
21   of Inspector General issued a report, *Most Critical Access Hospitals (CAH) Would*
22   *Not Meet The Location Requirements if Required to Re-Enroll in Medicare.* The
23   basis for the report was to determine whether certified CAHs could meet the
24   variety of regulatory requirements under re-certification today.

25
26

27   ─────────────────
     [6] A metropolitan statistical area (MSA) is an urbanized area with at least 50,000 inhabitants. A
28   rural census tract is a census tract that does not have significant commuting ties to an area with
     2,500 or more people. 42 U.S.C. §485.610(b). *See also* OIG Report, *supra.*

First Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

25.     The findings within the report are shocking. If CAHs were to undergo a re-certification examination today, nearly two-thirds would not meet the location requirement and 846 out of 1,329 would not meet the rural requirement. From the executive summary:

"Nearly two-thirds of CAHs **would not meet the location requirements if required to re-enroll. The vast majority of these CAHs would not meet the distance requirement**. CMS does not have the authority to decertify most of these CAHs, as most of these CAHs are NP CAHs. However, if CMS were authorized to reassess whether all CAHs should maintain their certifications, and concluded that some should be decertified, Medicare and beneficiaries could realize substantial savings. If CMS had decertified CAHs that were 15 or fewer miles from their nearest hospitals in 2011, Medicare and beneficiaries would have saved $449 million." (emphasis added) Department of Health and Human Services, Office of Inspector General,OEI-05-12-00080, Most Critical Access Hospitals Would Not Meet the Location Requirements if Required to Re-Enroll in Medicare, (August 2013) (Retrieved from https://oig.hhs.gov/oei/reports/oei-05-12-00080.pdf on November 3, 2017).

26.     The OIG report never identifies Hospital by name, or location. Notably, the list of 846 hospitals that do not meet the location requirement put together by the OIG *does not* include Hospital.  In fact, of the 846 CAHs throughout the United States that the OIG claims do not meet the location requirements, only four (4) are located in California.  These four include the Frank R. Howard Memorial Hospital in Willis, California; Redwood Memorial in Fortuna; Healdsburg District Hospital in Healdsburg; and Colorado Medical Center in Needles.[7]

---

[7] Each of these facilities is identified as failing to satisfy the distance requirement in the OIG

First Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

1

2                                    **FRAUDULENT PRACTICES**

3          27.    Hospital's prior effort to obtain special status for purposes of Medicare

4    payments failed. Twenty-one years ago, on August 21, 1995, the Ninth Circuit

5    refused to reverse a decision dismissing the civil action brought by San Bernardino

6    Mountains Community Hospital District against the Secretary of the Department of

7    Health and Human Services to "be classified as a sole community hospital to be

8    exempted from cost limits established under the Medicare program and thereby

9    increase the amount it is reimbursed for treating Medicare patients." *See San*

10   *Bernardino Mountains Community Hosp. Dist. v. Secretary of Health & Human*

11   *Servs.*, 63 F.3d 882, 886-87 (9th Cir. 1995) (holding that inclusion of phrase "as

12   determined by the Secretary" in Medicare Act's definition of "sole community

13   hospital" "make[s] clear that Congress intended to delegate to the Secretary the task

14   of outlining and defining the criteria for attaining sole community hospital status").

15         28.    In *San Bernardino*, the court upheld a HHS regulation that established

16   when a hospital qualified as a "sole community hospital," which would result in an

17   exemption from the limits imposed by the Tax Equity and Fiscal Responsibility Act

18   of 1982, 42 U.S.C. §§ 1395ww(a)-(b). The hospital argued in that action to the

19   District Court that the Secretary's regulation inappropriately prevented any hospital

20   not located in a "rural area" (as that term was statutorily defined) to qualify as a

21   "sole community hospital" because the statutory criteria for a "sole community

22   hospital" did not require a hospital to be in a "rural area." *Id.* at 886. The court

23   concluded that "Congress intended to delegate to the Secretary the task of outlining

24   and defining the criteria for attaining sole community hospital status." Id. at 886-

25   887.

26

27   _____

        Report.
28
                                              - 9 -

                     First Amended Complaint for Damages / Demand For Jury

29. Since July 2002, when it was certified as a CAH, the Hospital has held itself out to be a CAH serving a rural area in San Bernardino, California, even though it does not qualify as a CAH. First, the Hospital is not designated as an NP CAH by the State of California, and as such was not designated as an NP CAH before January 1, 2006. In a phone call by Relator with Ms. Jennifer Brooks, the Program Coordinator of the Medicare Rural Hospital Flexibility/Critical Access Hospital (FLEX/CAH) Program at (916) 324-7942 confirmed that there are only three necessary providers in the State of California, and the Hospital is not among them.

30. Second, the Hospital does not meet the distance requirements for CAH certification. The nearest hospital is St. Bernardine Medical Center in San Bernardino. This facility is a large 342-bed non-profit acute care hospital with the latest technology and advanced services, from family care to cardiac surgery. Notably this facility has served the San Bernardino community for many years, dating all the way back to pre-WWII. On October 10, 1931, California Governor James J. Rolph laid the cornerstone of St. Bernardine. By 1956, St. Bernardine Medical Center operated with 245 beds. With the continuous existence of St. Bernardine Medical Center, the ability for Hospital to obtain CAH status for any date in which CMS considered the designation is simply non-existent.

31. According to Google Maps, the most direct route between the two facilities results in a geographic distance between the two hospitals of 23.9 miles. That route travels over California state highways 18 and 173. Relator verified the distance by driving the route. Because the total distance is less than 35 miles, 15 or more miles of this route must be either "mountains terrain" or "secondary roads." *See* 42 CFR § 485.610, "Condition of participation: Status and location."

    a. To be eligible for the lesser distance standard due to the secondary road criteria under §485.610(c) the CAH must document that there is

- 10 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

a drive of more than 15 miles between the CAH and any hospital. CMS' State Operations Manual (Chapter 2, "Certification Process" Rev. 154, 6-10-16, p. 259)[8] expressly defines a "primary road" as "[a] numbered State highway with 2 or more lanes each way."

The distance between the 210 freeway and 18 and 138 junctures is 11.5 miles, and this route is two lanes in each direction. This means there is only 12.4 miles of secondary roads (23.9 − 11.5), and not the necessary 15 miles to trigger this exception.

b. Being located within a mountain range in and of itself does not without more trigger the "mountainous terrain" exception. The roads on the travel route from the CAH to any other hospital or CAH must have either of the following characteristics:

i. Extensive sections of roads with steep grades (i.e., greater than 5 percent), continuous abrupt and frequent changes in elevation or direction, or any combination of horizontal and vertical alignment that causes heavy vehicles to operate at crawl speeds for significant distances or at frequent intervals. *Alternatively*, the route can be considered mountainous terrain by the State Transportation or Highway agency, based on significantly more complicated than usual construction techniques that were originally required to achieve compatibility between the road alignment and surrounding rugged terrain. For example, because the changes in elevation and direction are abrupt in mountainous terrain, roadbeds may require frequent benching, side hill excavations, and embankment fills. The route does not

[8] URL https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c02.pdf

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

First Amended Complaint for Damages / Demand For Jury

satisfy this criterion under either option. Based on the definition above, the 11.5 miles from the 210 freeway to the 138 junction is not mountainous terrain.  Trucks routinely go up and down the mountain using this route and they are not going at "crawl speeds."  Furthermore, there is a stretch, 2-3 miles, of 18 hwy just west of the 178 junction which is not mountainous terrain. This part is flat and reasonably straight and goes by the Rim of The World high school. With the 11.5 miles and the additional two miles, there is only about 10.4 miles (23.9 – 13.5) that could be considered mountainous terrain, with most of this being 178 hwy. On information and belief, the route has not been designated by CalTrans, which does not use "mountainous terrain" as a defined road designation.

32.    Nonetheless, from 2002 to the present, the Hospital has filed cost reports with Medicare for reimbursement for health care services and provided to Medicare beneficiaries using CMC Form 2552, at the rates authorized for CAHs. CMC Form 2552 contains a certification, as follows:

"MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT" (emphasis in original).

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

First Amended Complaint for Damages / Demand For Jury

33.    Medicare cost reports (CMS Form 2552) presented by CAHs also contain an additional certification, in accord with 42 C.F.R. § 413.24 (f)(4)(iv), entitled "Certification By Officer Or Administrator Of Provider(s)," which states as follows:

> "I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations" (emphasis in original).

34.    In submitting CMC Form 2552 to Medicare for reimbursement, the Hospital affirmed that the information provided therein (including that it qualified as a CAH) was truthful and honest.

35.    Moreover, as a Medicare provider and participant in the Medicare Program, the Hospital was required to enter into agreements with CMS through "Medicare Enrollment Applications" on a form known as a "CMS-855A" wherein the Hospital, through an authorized responsible officer, swore that it "understand(s) that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare."

First Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

36.     Thus, the representations as to the costs reflected in the Medicare cost reports were presumed by Medicare to be truthful, accurate, and allowable under the applicable Medicare laws and regulations. These representations were and are material to, and indeed (via the certifications listed above) are a condition of Medicare reimbursement.

37.     Medicare relied on the information disclosed in the Medicare cost reports in determining the reimbursement rates and the amounts paid to the Hospital. CMS Form 2552 makes this clear by stating

38.     "This report is required by law (42 U.S.C. 1395g; 42 CFR 413.20(b)). Failure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42 U.S.C. 1395g)" (parentheticals in original).

39.     At all times relevant to the allegations in this First Amended Complaint, HHS, through CMS, provided Medicare reimbursements for health care services provided to Medicare patients at the Hospital based on the cost reports submitted by the Hospital.

40.     By purposefully filing CMS Form 2552 and therein affirming its purported status as a CAH, the Defendants substantially overcharged, or caused others to overcharge, the Government for inpatient and outpatient services provided to Medicare beneficiaries.  As a result of this misrepresentation, the Government overpaid for such services.

41.     Defendants were aware or should have been aware that they did not meet the distance requirements given the absence of evidence to trigger the "mountainous terrain" exception, the presence of primary roads leading to the Hospital and the Hospital's proximity to St. Bernardine Medical Center, 2101 North Waterman Avenue, San Bernardino, CA 92404. Thus, each Medicare cost report (CMS Form 2552) filed by Defendants in the applicable limitations period constitutes a false statement supported a false claim for payment.

- 14 -

42.     From July 1, 2007 through November 24, 2008, Adomitis worked as the Chief Financial Officer of the Hospital. During that time, Plaintiff alleges defendant purposefully conducted no survey or audit to certify, re-certify or otherwise verify all CAH Conditions of Participation (including the distance requirement) to submit claims to CMS so that it would not have to correct the erroneous representation that Hospital was properly designated as a CAH. Every single payment from CMS is wholly predicated on compliance with the CAH Conditions of Participation, and Hospital willfully ignored scrutinizing compliance by failing to implement any internal policy or procedure that would to jeopardize its status. And so Hospital continued to submit claims to CMS under the CAH program.

43.     Since 2010, Hospital has fraudulently charged CMS substantial sums. In 2010, Hospital fraudulently charged $3,218,833.00 to CMS; 2011, Hospital fraudulently charged CMS $4,230,312.00; 2012, Hospital fraudulently charged CMS $3,967,861.00; 2013 Hospital fraudulently charged $5,160,031.00; 2014 Hospital fraudulently charged $5,784,459.00; and 2015 Hospital fraudulently charged $7,411,047.00.

## COUNT I
## KNOWINGLY PRESENTING FALSE CLAIMS
### in violation of 31 U.S.C. § 3729(a)(1)(A)
### Claim By and on Behalf of the United States under the False Claims Act
### Against All Defendants

44.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 43 as though fully set forth herein.

45.     By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to Medicare false or fraudulent claims for reimbursement in violation of 31 U.S.C. § 3729(a)(1)(A). In particular, Defendants presented and caused to be presented to Medicare false, fraudulent,

- 15 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

misleading, and incomplete information in the Hospital's Medicare cost reports.

46.    Medicare relied on these fraudulent cost reports in determining the Medicare reimbursement rates and the amount of reimbursements to be paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

47.    The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

48.    As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented, or caused to be presented, and other monetary relief as appropriate.

**COUNT II**
**USING FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE CLAIMS in violation of 31 U.S.C. § 3729(a)(1)(B)**
**Claim By and on Behalf of the United States under the False Claims Act Against All Defendants**

49.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 48 as though fully set forth herein.

50.    By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, made, used, and/or caused to be made or used, false records, statements, and certifications material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B). In particular, Defendants made, used, and caused to be made or used, false records, statements, and certifications in the Medicare cost reports of the Hospital.

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

51.     Medicare relied on these fraudulent records, statements, and certifications in determining the Medicare reimbursement rates and the amount of Medicare reimbursements paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

52.     The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

53.     As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false records, statements, and certifications made to the Medicare program and other monetary relief as appropriate.

## COUNT III
### FAILING TO REFUND OVERPAYMENTS OWED TO THE GOVERNMENT in violation of 31 U.S.C. § 3729(a)(1)(G)
### Claim By and on Behalf of the United States under the False Claims Act Against All Defendants

54.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 53 as though fully set forth herein.

55.     By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, received millions of dollars from Medicare to which they were not entitled and which they had an obligation to refund, but Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, failed to return this wrongfully-obtained money to Medicare. Defendants also concealed the false, misleading, and incomplete information included in the Hospital's Medicare cost

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

First Amended Complaint for Damages / Demand For Jury

1   reports, and never refunded, or offered to refund, any of the money wrongfully

2   obtained. These actions violated 31 U.S.C. § 3729(a)(1)(G).

3       56.     The false representations, records, statements, reports, and

4   certifications described herein were material to Medicare's decision to provide

5   reimbursement to the Hospital and had a natural tendency to influence and did

6   influence those decisions. In addition, Defendants' concealment of the false and

7   fraudulent expenses impaired Medicare's ability to pursue refunds of the improperly

8   paid amounts.

9       57.     As a result of these matters, the United States has suffered actual

10  damages and is entitled to recover three times the amount by which it has been

11  damaged, plus civil money penalties of not less than $5,500 and not more than

12  $11,000 for each of the false claims, and other monetary relief as appropriate.

### PRAYER

WHEREFORE, Relator prays judgment against Hospital and Does 1 through

50, and each of them, as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. § 3279 et

seq.;

2.      That this Court enter judgment against Defendants in an amount equal

to three times the amount of damages the United States has sustained because of

Defendants' actions, plus a civil penalty of not less than $5,000 and not more than

$11,000 for each violation of 31 U.S.C. § 3279 et seq.; for claims accruing after

November 2, 2015, civil penalties increase of not less than $10,781.40 and

$21,562.80 per violation of 31 U.S.C. § 3279 et seq.

3.      That the Relator be awarded the maximum amount allowed pursuant to

§3730(d) of the False Claims Act;

4.      That Relator be awarded all costs of this action, including attorneys'

fees and expenses;

First Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

5.      That Relator recover other and further relief as the court shall deem appropriate.

DATED: __11/13__, 2017.        **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**

By: _____

    Esperanza Cervantes Anderson, Esq.
    Attorney for Plaintiff/relator
    FRANK ADOMITIS

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED: __11/13__, 2017.        **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**

By: _____

    Esperanza Cervantes Anderson, Esq.
    Attorney for Plaintiff/relator
    FRANK ADOMITIS