Esperanza Cervantes Anderson | SBN 197953
**LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
1037 North Allen Avenue
Pasadena, California 91104
Tel.:   (626) 219-6773
Fax:   (626) 389-8911

Attorney for Plaintiff Relator
FRANK ADOMITIS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u> FRANK ADOMITIS, an individual,<br><br>Relator,<br><br>v.<br><br>SAN BERNARDINO MOUNTAINS COMMUNITY HOSPITAL DISTRICT; DOES 1 through 20, inclusive,<br><br>Defendants. | Case No. Case No.: 5:17-cv-00002-JGB-KK<br>(Hon. Jesus G. Bernal)<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**<br>(31 U.S.C. §§ 3729 et seq.)<br><br>JURY TRIAL DEMANDED |

**NATURE OF THE ACTION**

1.      This is a civil action brought by the United States, as Plaintiff, against Defendants San Bernardino Mountains Community Hospital District (the "Hospital") and DOES 1-10 for Medicare fraud involving millions of dollars and both factually and legally false claims, lasting over the course of more than a decade, and continuing at present. This suit seeks damages, civil money penalties, and other relief under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended by the False Claims Act Amendments of 1986, the Fraud Enforcement and Recovery Act

1   of 2009, Pub. L. 111-21 ("FERA"), and the Patient Protection and Affordable Care

2   Act of 2010, Pub. L. 111-148.

3       2.    The FCA was originally enacted during the Civil War to address fraud

4   against the Government. Congress substantially amended the Act in 1986 to enhance

5   the Government's ability to recover losses sustained as a result of fraud against the

6   United States after finding that fraud in federal programs was pervasive and that the

7   Act, which Congress characterized as the primary tool for combating Government

8   fraud, was in need of modernization. Congress intended the amendments to create

9   incentives for individuals with knowledge of fraud against the Government to

10  disclose information without fear of reprisals or Government inaction, and to

11  encourage the private bar to commit legal resources to prosecuting fraud on the

12  Government's behalf.

13      3.    The FCA provides that any person who presents or causes to be

14  presented false or fraudulent claims for payment or approval to the United States

15  Government, or knowingly makes, uses, causes to be made or used false records and

16  statements to induce the United States to pay or prove false and fraudulent claims,

17  is liable for a civil penalty of up to $11,000 for each such claim, plus three times the

18  amount of damages sustained by the federal Government.

19      4.    The FCA allows any person having information about false or

20  fraudulent claims to bring an action on behalf of the Government, and to share in

21  any recovery. The FCA requires that the complaint be filed under seal for a minimum

22  of 60 days (without service on the Defendants during that time) to enable the United

23  States to: (a) conduct its own investigation without the Defendants' knowledge, and

24  (b) determine whether to join the action.

25      5.    Based on the FCA, *qui tam* plaintiff and relator Frank Adomitis seeks

26  to recover all available damages, civil penalties, and other relief for the federal

27  violations alleged herein.

28

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 2 -

**PARTIES**

6.     Plaintiffs are the United States of America (United States or Government) and the relator, Frank Adomitis. The United States files this Second Amended Complaint on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), on behalf of the Medicare program.

7.     Plaintiff/relator Frank Adomitis ("Relator") is an individual residing in the County of San Bernardino, State of California. From July 1, 2007 through November 24, 2008, Adomitis worked as the Chief Financial Officer of the Hospital.

8.     Defendant San Bernardino Mountains Community Hospital District (the "Hospital") is a 37-bed facility located at 9101 Hospital Rd., POB 70, Lake Arrowhead, CA  92352. The Hospital is operated under the San Bernardino Mountains Community Healthcare District and has operated from 1947 to the present.

9.     Relator is ignorant of the true names and capacities, whether individual, corporate, or associate, of those defendants fictitiously sued as Does 1 through 20 inclusive and so Relator sues them by these fictitious names.  Relator is informed and believes that each of the DOE defendants is in some manner responsible for the conduct alleged herein. Upon discovering the true names and capacities of these fictitiously named Defendants, Relator will amend this complaint to show the true names and capacities of these fictitiously named defendants.

10.     Unless otherwise alleged in this complaint, Relator is informed, and on the basis of that information and belief alleges, that at all times herein mentioned, each of the remaining codefendants, in doing the things hereinafter alleged, were acting within the course, scope, and under the authority of their agency, employment, or representative capacity, with the consent of her/his/its codefendants.

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 3 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 31 U.S.C. § 3730. The Second Amended Complaint is not based upon allegations or transactions that have been publicly disclosed under 31 U.S.C. § 3730(e). In addition, the Relator has direct and independent knowledge of the information on which the allegations and transactions are based and voluntarily provided the information to the Government before filing this action.

12.    Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §§ 139l(b) and 1395(a) and 31 U.S.C. § 3732(a), as the Defendants are found in, have or have had an agent or agents, have or have had contacts, and transact or have transacted business in this district.

## CRITICAL ACCESS HOSPITAL ("CAH") FRAMEWORK

13.    The United States, through HHS and its component agency, CMS, administers the Medicare program, including payments made on a beneficiary's behalf for inpatient and outpatient hospital services provided by a hospital that has entered into an agreement with the Secretary to participate in the Medicare program. Section 1814(1) of the Social Security Act (42 U.S.C. § 1395f(1)) provides for payment of Part A, inpatient CAH services, and Section 1834(g) (42 U.S.C.§ 1395m(g)) provides for payment of Part B, outpatient CAH Services. CMS pays Medicare bills, also called claims, received from hospitals such as the Hospital, and all such claims are paid with federal funds.

14.    In 1997, the Balanced Budget Act ("BBA") created the CAH certification to ensure that hospital care is accessible to beneficiaries in rural communities.  CAH hospitals are typically small health care organizations with no more than 25 hospital beds that can be used for either inpatient or "swing bed"

- 4 -

services,[1] and are generally located in rural communities with a limited employment and economic base. In the United States, there are approximately 1,300 to 1,400 CAHs.[2]

15. CAHs are reimbursed differently by Medicare than other acute care hospitals. CAHs receive federal reimbursement incentives designed to attract hospital providers to communities that would otherwise have difficulty receiving hospital care. Specifically, CAHs receive 101 percent (101%) of Medicare's share of their reasonable and allowable costs for outpatient, inpatient, laboratory, and ambulance services, as well as for "swing bed" services). *See* 42 C.F.R. §§ 413.70, 413.114. In contrast, traditional hospital facilities are paid under Prospective Payment Systems through which Medicare reimbursement is fixed and capped. Medicare generally pays for the same medical services provided by a CAH as by other acute care hospitals, but CAH payments are based on each CAH's reasonable and allowable costs and the share of those costs allocated to Medicare patients. Thus, as the costs increase, the Medicare reimbursement rates to CAHs also increase and, as these rates increase, so too do the Medicare reimbursements.

16. The Medicare reimbursement rates for CAHs are computed for inpatient services as an average cost per day based on historical data multiplied by 101% and paid on an interim basis. The Medicare reimbursement rates for CAHs are computed for outpatient services by multiplying the billed charge of each claim by the hospital's cost-to-charge ratio and then adding 1 percent (1%) to that amount.

17. Hospitals must meet specific requirements in order to qualify for the CAH certification and receive the favorable Medicare reimbursements described

---

[1] "Swing beds" is a reimbursement term that reflects a CAH's ability to use its beds interchangeably for either acute-care or post-acute skilled nursing care. They are designed to offer care to patients who no longer need acute care, but do require additional inpatient services. *See* 42 C.F.R. § 485.620.

[2] *See also* OIG Report, *infra.*

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

above. Specifically, hospitals must meet the requirements set forth in the CAH Conditions of Participation (which lay out health, safety, and location-related requirements) to receive the CAH certification.

18. Because the intent of the CAH certification is to ensure access to care in rural communities, CAHs must meet two location-related requirements. 42 U.S.C. §1396i-4(c)(2). CAHs **must** be located at least a minimum distance from hospitals (including acute-care, psychiatric, rehabilitation, long-term, and children's hospitals) and other CAHs, and they **must** be located in rural areas.[3]

19. **Distance Requirement.** Hospitals that wish to obtain the CAH certification can meet the distance requirement in one of two ways: (1) by being located more than a 35-mile drive from a hospital or another CAH or (2) by being located more than a 15-mile drive from a hospital or another CAH in areas of mountainous terrain[4] or areas where only secondary roads[5] are available. 42 CFR §485.610(c).

20. **Rural requirement.** Hospitals that wish to obtain the CAH certification can meet the rural requirement by being located either in rural areas or in areas that are treated as rural. 42 CFR §485.610(b). CMS uses a formula based

[3] Department of Health and Human Services, Office of Inspector General, OEI- 05-12-00080, *Most Critical Access Hospitals Would Not Meet the Location Requirements if Required to Re-Enroll in Medicare,* (August 2013) (Retrieved from https://oig.hhs.gov/oei/reports/oei-05-12-00080.pdf on November 3, 2017).
[4] Prior to 2013, CMS defined "mountainous terrain" as areas identified as such on any official maps or other documents published by the State agency responsible for highways in the State (typically a Department of Transportation or Highways) or by USGS. In April 2013, CMS published a uniform definition of "mountainous terrain" which States are to use when certifying hospitals as CAHs. According to this definition, roads that travel through mountainous terrain must be located in a mountain range and meet one of two additional requirements related to ease of travel or effort required to construct the roads. *See also* OIG Report, *supra.*
[5] CMS defines "secondary roads" as roads that are not primary roads. Primary roads include Federal highways (including interstate highways), state highways with two or more lanes in one direction, and roads that—in accordance with U.S. Geological Survey (USGS) standards—are shown on maps as primary highways. Secondary roads typically are one-lane State highways and all other local roads. 42 CFR §485.610(c). *See also* OIG Report, *supra.*

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

on multiple criteria to determine rural status. Examples of these criteria include whether a CAH is located outside a metropolitan statistical area (MSA), located inside a rural census tract, or located in an area designated as rural by State law or regulation.[6]

21. **Additional CAH requirements.** To be certified as CAHs, facilities must meet additional requirements beyond the location requirements described above. For example, CAHs cannot have more than 25 beds that are used for acute care or "swing-bed" patients (42 CFR §485.620(a)), they must offer 24-hour emergency services (42 CFR §485.618(a)), and they must achieve an annual average length of stay for patients that does not exceed 96 hours.42 CFR §620(b).

22. **Necessary Provider CAHs.** Prior to January 1, 2006, states had discretion to designate hospitals that did not meet the distance requirement as "necessary provider" (NP) CAHs. NP CAHs had to comply with all of the CAH Conditions of Participation at the time of their certification.

23. CAHs that were designated NP CAHs prior to January 1, 2006 are permanently exempt from meeting the distance requirement, unless they relocate. Effective January 1, 2006, the Medicare Prescription Drug, Improvement, and Modernization Act prohibited the creation of new NP CAHs, but allowed existing NP CAHs to retain their NP designations indefinitely, as long as they continue to meet all other CAH requirements.

24. In August 2013, the Department of Health and Human Services Office of Inspector General issued a report, *Most Critical Access Hospitals (CAH) Would Not Meet The Location Requirements if Required to Re-Enroll in Medicare.* The basis for the report was to determine whether certified CAHs could meet the variety of regulatory requirements under re-certification today.

---

[6] A metropolitan statistical area (MSA) is an urbanized area with at least 50,000 inhabitants. A rural census tract is a census tract that does not have significant commuting ties to an area with 2,500 or more people. 42 U.S.C. §485.610(b). *See also* OIG Report, *supra.*

- 7 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

25.     The findings within the report are shocking. If CAHs were to undergo a re-certification examination today, nearly two-thirds would not meet the location requirement and 846 out of 1,329 would not meet the rural requirement. From the executive summary:

> "Nearly two-thirds of CAHs **would not meet the location requirements if required to re-enroll. The vast majority of these CAHs would not meet the distance requirement**. CMS does not have the authority to decertify most of these CAHs, as most of these CAHs are NP CAHs. However, if CMS were authorized to reassess whether all CAHs should maintain their certifications, and concluded that some should be decertified, Medicare and beneficiaries could realize substantial savings. If CMS had decertified CAHs that were 15 or fewer miles from their nearest hospitals in 2011, Medicare and beneficiaries would have saved $449 million." (emphasis added) Department of Health and Human Services, Office of Inspector General, OEI-05-12-00080, Most Critical Access Hospitals Would Not Meet the Location Requirements if Required to Re-Enroll in Medicare, (August 2013) (Retrieved from https://oig.hhs.gov/oei/reports/oei-05-12-00080.pdf on November 3, 2017).

26.     The OIG report never identifies Hospital by name, or location. Notably, the list of 846 hospitals that do not meet the location requirement put together by the OIG *does not* include Hospital.  In fact, of the 846 CAHs throughout the United States that the OIG claims do not meet the location requirements, only four (4) are located in California.  These four include the Frank R. Howard Memorial Hospital in Willis, California; Redwood Memorial in Fortuna; Healdsburg District Hospital in Healdsburg; and Colorado Medical Center

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 8 -

1    in Needles.[7]

2                           **FRAUDULENT PRACTICES**

3           27.    Hospital's prior effort to obtain special status for purposes of Medicare

4    payments failed. Twenty-one years ago, on August 21, 1995, the Ninth Circuit

5    refused to reverse a decision dismissing the civil action brought by San Bernardino

6    Mountains Community Hospital District against the Secretary of the Department of

7    Health and Human Services to "be classified as a sole community hospital to be

8    exempted from cost limits established under the Medicare program and thereby

9    increase the amount it is reimbursed for treating Medicare patients." *See San*

10   *Bernardino Mountains Community Hosp. Dist. v. Secretary of Health & Human*

11   *Servs.*, 63 F.3d 882, 886-87 (9th Cir. 1995) (holding that inclusion of phrase "as

12   determined by the Secretary" in Medicare Act's definition of "sole community

13   hospital" "make[s] clear that Congress intended to delegate to the Secretary the task

14   of outlining and defining the criteria for attaining sole community hospital status").

15          28.    In *San Bernardino*, the court upheld a HHS regulation that established

16   when a hospital qualified as a "sole community hospital," which would result in an

17   exemption from the limits imposed by the Tax Equity and Fiscal Responsibility Act

18   of 1982, 42 U.S.C. §§ 1395ww(a)-(b). The hospital argued in that action to the

19   District Court that the Secretary's regulation inappropriately prevented any hospital

20   not located in a "rural area" (as that term was statutorily defined) to qualify as a

21   "sole community hospital" because the statutory criteria for a "sole community

22   hospital" did not require a hospital to be in a "rural area." *Id.* at 886. The court

23   concluded that "Congress intended to delegate to the Secretary the task of outlining

24   and defining the criteria for attaining sole community hospital status." *Id.* at 886-

25   887.

26

27   ─────────────
     [7] Each of these facilities is identified as failing to satisfy the distance requirement in
28   the OIG Report.

Law Office of Esperanza Cervantes Anderson
Pasadena, California

29.   Prior to 2002, Mountains participated in the Medicare program as a regular provider of healthcare services.  On or about April 17, 2002, Mountains received an analysis showing the financial benefits of converting to CAH status.  The report showed that Mountains would have earned an additional $173,369 in Medicare reimbursement for the year analyzed if Mountains had been a CAH hospital.

30.   One month later, on or about May 16, 2002, the Hospital applied for CAH status by making the affirmative representation that it met the distance requirement for CAH status as required by 42 CFR 485.610(c) - Condition of participation.  Specifically, Mountains' CEO James Hoss answered the following question under the heading of "Compliance with Federal Criteria" in the affirmative:

> "Is you [sic] facility more than a 35 mile drive from any other general acute hospital (in mountainous terrain or in areas with only secondary roads available, the mileage criterion is 15 miles), or certified by the State as a "Necessary Provider"* of health care services to residents in the area?"

> "(*) A "Necessary Provider" is a rural hospital which does not meet the mileage requirements but is designated by the state after an exception review."

31.   Hoss made answered the above question affirmatively even though he knew or should have known that the Hospital was not more than 35 miles from St. Bernardine or more than 15 miles of mountainous terrain from St. Bernardine.

32.   In or about July 2002, Mountains was certified as a CAH hospital.

33.   Since July 2002, when it was certified as a CAH, the Hospital has held itself out to be a CAH serving a rural area in San Bernardino, California, even though it does not qualify as a CAH.  First, the Hospital is not designated as an NP

- 10 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

CAH by the State of California, and as such was not designated as an NP CAH before January 1, 2006. Relator was aware that the Hospital was not an NP when he worked there between July 1, 2007 and November 24, 2008. In a phone call by Relator with Ms. Jennifer Brooks, the Program Coordinator of the Medicare Rural Hospital Flexibility/Critical Access Hospital (FLEX/CAH) Program at (916) 324-7942 confirmed that there are only three necessary providers in the State of California, and the Hospital is not among them.

34.   Second, the Hospital does not meet the distance requirements for CAH certification. The nearest hospital is St. Bernardine Medical Center in San Bernardino. This facility is a large 342-bed non-profit acute care hospital with the latest technology and advanced services, from family care to cardiac surgery. Notably this facility has served the San Bernardino community for many years, dating all the way back to pre-WWII. On October 10, 1931, California Governor James J. Rolph laid the cornerstone of St. Bernardine. By 1956, St. Bernardine Medical Center operated with 245 beds. With the continuous existence of St. Bernardine Medical Center, the ability for Hospital to obtain CAH status for any date in which CMS considered the designation is simply non-existent.

35.   According to Google Maps, the most direct route between the two facilities results in a geographic distance between the two hospitals of 23.9 miles. That route travels over California state highways 18 and 173. In February 2015, Relator verified the distance by driving the route.

36.   Because the total distance is less than 35 miles, 15 or more miles of this route must be either "mountains terrain" or "secondary roads." *See* 42 CFR § 485.610, "Condition of participation: Status and location."

    a. To be eligible for the lesser distance standard due to the secondary road criteria under §485.610(c) the CAH must document that there is a drive of more than 15 miles between the CAH and any hospital. CMS' State Operations Manual (Chapter 2, "Certification Process"

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

Rev. 154, 6-10-16, p. 259)[8] expressly defines a "primary road" as "[a] numbered State highway with 2 or more lanes each way."

The distance between the 210 freeway and 18 and 138 junctures is 11.5 miles, and this route is two lanes in each direction. This means there is only 12.4 miles of secondary roads (23.9 – 11.5), and not the necessary 15 miles to trigger this exception.

b. Being located within a mountain range in and of itself does not without more trigger the "mountainous terrain" exception. The roads on the travel route from the CAH to any other hospital or CAH must have either of the following characteristics:

i. Extensive sections of roads with steep grades (i.e., greater than 5 percent), continuous abrupt and frequent changes in elevation or direction, or any combination of horizontal and vertical alignment that causes heavy vehicles to operate at crawl speeds for significant distances or at frequent intervals. *Alternatively*, the route can be considered mountainous terrain by the State Transportation or Highway agency, based on significantly more complicated than usual construction techniques that were originally required to achieve compatibility between the road alignment and surrounding rugged terrain. For example, because the changes in elevation and direction are abrupt in mountainous terrain, roadbeds may require frequent benching, side hill excavations, and embankment fills. The route does not satisfy this criterion under either option. Based on the definition above, the 11.5 miles from the 210 freeway to the 138 junction

[8] URL https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c02.pdf

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

is not mountainous terrain.  Trucks routinely go up and down the mountain using this route and they are not going at "crawl speeds."  Furthermore, there is a stretch, 2-3 miles, of 18 hwy just west of the 178 junction which is not mountainous terrain. This part is flat and reasonably straight and goes by the Rim of The World high school. With the 11.5 miles and the additional two miles, there is only about 10.4 miles (23.9 − 13.5) that could be considered mountainous terrain, with most of this being 178 hwy. On information and belief, the route has not been designated by CalTrans, which does not use "mountainous terrain" as a defined road designation.

37. Nonetheless, from 2002 to the present, the Hospital has filed cost reports with Medicare for reimbursement for health care services and provided to Medicare beneficiaries using CMC Form 2552, at the rates authorized for CAHs. CMC Form 2552 contains a certification, as follows:

"MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT" (emphasis in original).

38. Medicare cost reports (CMS Form 2552) presented by CAHs also contain an additional certification, in accord with 42 C.F.R. § 413.24 (f)(4)(iv), entitled "Certification By Officer Or Administrator Of Provider(s)," which states as

- 13 -

follows:

> "I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations" (emphasis in original).

39.    In submitting CMC Form 2552 to Medicare for reimbursement, the Hospital affirmed that the information provided therein (including that it qualified as a CAH) was truthful and honest.

40.    Moreover, as a Medicare provider and participant in the Medicare Program, the Hospital was required to enter into agreements with CMS through "Medicare Enrollment Applications" on a form known as a "CMS-855A" wherein the Hospital, through an authorized responsible officer, swore that it "understand(s) that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare."

41.    Thus, the representations as to the costs reflected in the Medicare cost reports were presumed by Medicare to be truthful, accurate, and allowable under the applicable Medicare laws and regulations. These representations were and are material to, and indeed (via the certifications listed above) are a condition of

1    Medicare reimbursement.

2        42.    Medicare relied on the information disclosed in the Medicare cost

3    reports in determining the reimbursement rates and the amounts paid to the

4    Hospital. CMS Form 2552 makes this clear by stating

5            "This report is required by law (42 U.S.C. 1395g; 42 CFR 413.20(b)).

6            Failure to report can result in all interim payments made since the

7            beginning of the cost reporting period being deemed overpayments (42

8            U.S.C. 1395g)" (parentheticals in original).

9        43.    At all times relevant to the allegations in this Second Amended

10   Complaint, HHS, through CMS, provided Medicare reimbursements for health care

11   services provided to Medicare patients at the Hospital based on the cost reports

12   submitted by the Hospital.

13       44.    By purposefully filing CMS Form 2552 and therein affirming its

14   purported status as a CAH even though Defendants knew that they did not meet the

15   distance requirement and were not deemed a Necessary Provider, the Defendants

16   substantially overcharged, or caused others to overcharge, the Government for

17   inpatient and outpatient services provided to Medicare beneficiaries.  As a result of

18   this misrepresentation, the Government overpaid for such services.

19       45.    Defendants were aware or should have been aware that they did not

20   meet the distance requirements given the absence of evidence to trigger the

21   "mountainous terrain" exception, the presence of primary roads leading to the

22   Hospital and the Hospital's proximity to St. Bernardine Medical Center, 2101

23   North Waterman Avenue, San Bernardino, CA 92404. Thus, each Medicare cost

24   report (CMS Form 2552) filed by Defendants in the applicable limitations period

25   constitutes a false statement supported a false claim for payment. The failure to

26   meet the distance requirement is material to government's payment of claims

27   submitted by the Hospital as a CAH.  If Hospital is not a CAH, then Hospital's

28   reimbursement rate would be significantly smaller than the reimbursement rate the

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 15 -

1    Hospital enjoys as a CAH.  Thus, not meeting the distance requirement is material.

2    The government would not have reimbursed those claims at 101% reimbursement

3    rate had it known that the Hospital was not properly a CAH.

4        46.    While the False Claims Act imposes liability only when the claimant

5    acts "knowingly," it does not require that the person submitting the claim have

6    actual knowledge that the claim is false. A person who acts in reckless disregard or

7    in deliberate ignorance of the truth or falsity of the information, also can be found

8    liable under the Act. 31 U.S.C. 3729(b)[9].

9        47.    From July 1, 2007 through November 24, 2008, Adomitis worked as

10   the Chief Financial Officer of the Hospital.  Jim Hoss, the CEO of the Hospital,

11   required Relator, as CFO for the Hospital, to submit claims to CMS which

12   represented the Hospital as a CAH throughout his employment from July 2007

13   through November 2008.  Relator was told by Hoss that Mountains was a CAH

14   hospital because it met the distance requirements.  Relator was also informed that

15   Mountains was not a Necessary Provider.  Relator was not a compliance officer for

16   Mountains, and reasonably relied upon Hoss and the executive board to ensure that

17   full compliance with laws and Medicare Conditions of Payment to satisfy the

18   required rural and distance requirements needed to submit claims as a CAH.

19   Relator had never driven the distance between Hospital and St. Bernardine using

20   Hwy 18 prior to 2015 because he had never been required to drive this distance.

21   Relator has never lived in Lake Arrowhead, California (where Hospital is located)

22   and as such, did not have occasion to travel down Hwy 18 to get to San Bernardino,

23   California.  During the 16 months when Relator worked at the Hospital, Relator

24   lived in Highland, California, a city directly east of San Bernardino.  Relator

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

---

[9] (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

1    traveled up Hwy 330 to get to work at Hospital.  Since Hwy 330 is a narrow two-
2    lane that is clearly a secondary road for more than 15 miles of Relator's commute
3    from his home to the Hospital, Relator never questioned the representations at work
4    that the Hospital met the distance requirement necessary for CAH status.  Relator,
5    however, is aware that Hoss, as well as board member Keith Burkart, David Stern
6    and current CEO Charlie Harrison, all lived in Lake Arrowhead, California or areas
7    of San Bernardino that would have required routine travel on Hwy 18 sufficient to
8    put them on notice that the Hospital did not meet the distance requirement.  Indeed,
9    Hwy 18 is a faster route than most other routes from Lake Arrowhead because it
10   has two lanes in both directions for most of the distance.

11        48.    During the time of his employment, Plaintiff alleges defendant
12   purposefully conducted no survey or audit to certify, re-certify or otherwise verify
13   all CAH Conditions of Participation (including the distance requirement) to submit
14   claims to CMS so that it would not have to correct the erroneous representation that
15   Hospital was properly designated as a CAH.  Thus, Hospital acted with actual
16   knowledge, deliberate ignorance or reckless disregard of the falsity of its claim that
17   it was a CAH,  Every single payment from CMS is wholly predicated on
18   compliance with the CAH Conditions of Participation, and Hospital willfully
19   ignored scrutinizing compliance by failing to implement any internal policy or
20   procedure that would to jeopardize its status. And so Hospital continued to submit
21   claims to CMS under the CAH program.

22        49.    During the time period between July 1, 2002 to June 30, 2003 Hospital
23   has fraudulently charged CMS $3,517,679; between July 1, 2003 and June 30,
24   2004, Hospital has fraudulently charged CMS $3,620,424; between July 1, 2004
25   and June 30, 2005, Hospital has fraudulently charged CMS $4,109,310; between
26   July 1, 2005 and June 30, 2006, Hospital has fraudulently charged CMS
27   $4,419,788; between July 1, 2006 and June 30, 2007, Hospital has fraudulently
28   charged CMS $4,982,734; between July 1, 2007 and June 30, 2008, Hospital has

- 17 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

fraudulently charged CMS $5,409,052; July 1, 2008 and June 30, 2009, Hospital has fraudulently charged CMS $5,175,452; and between July 1, 2009 and June 30, 2010, Hospital has fraudulently charged CMS $5,443,389.

50.    Since 2010, Hospital has fraudulently charged CMS substantial sums. In 2010, Hospital fraudulently charged $3,218,833.00 to CMS; 2011, Hospital fraudulently charged CMS $4,230,312.00; 2012, Hospital fraudulently charged CMS $3,967,861.00; 2013 Hospital fraudulently charged $5,160,031.00; 2014 Hospital fraudulently charged $5,784,459.00; and 2015 Hospital fraudulently charged $7,411,047.00.

**COUNT I**
**KNOWINGLY PRESENTING FALSE CLAIMS**
**in violation of 31 U.S.C. § 3729(a)(1)(A)**
**Claim By and on Behalf of the United States under the False Claims Act**
**Against All Defendants**

51.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 43 as though fully set forth herein.

52.    By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to Medicare false or fraudulent claims for reimbursement in violation of 31 U.S.C. § 3729(a)(1)(A). In particular, Defendants presented and caused to be presented to Medicare false, fraudulent, misleading, and incomplete information in the Hospital's Medicare cost reports.

53.    Medicare relied on these fraudulent cost reports in determining the Medicare reimbursement rates and the amount of reimbursements to be paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

54.    The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did

- 18 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

1   influence those decisions.

2        55.    As a result of the false claims presented, and/or caused to be presented,

3   the United States has suffered actual damages and is entitled to recover three times

4   the amount by which it has been damaged, plus civil money penalties of not less

5   than $5,500 and not more than $11,000 for each of the false claims presented, or

6   caused to be presented, and other monetary relief as appropriate.

7

8                             **COUNT II**

**USING FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE**

9          **CLAIMS in violation of 31 U.S.C. § 3729(a)(1)(B)**

**Claim By and on Behalf of the United States under the False Claims Act**

10                        **Against All Defendants**

11        56.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through

12   48 as though fully set forth herein.

13        57.    By virtue of the wrongful acts described herein, from 2002 through the

14   present, Defendants, with actual knowledge, reckless disregard, or deliberate

15   ignorance, made, used, and/or caused to be made or used, false records, statements,

16   and certifications material to false or fraudulent claims in violation of 31 U.S.C. §

17   3729(a)(1)(B). In particular, Defendants made, used, and caused to be made or

18   used, false records, statements, and certifications in the Medicare cost reports of the

19   Hospital.

20

21        58.    Medicare relied on these fraudulent records, statements, and

22   certifications in determining the Medicare reimbursement rates and the amount of

23   Medicare reimbursements paid to the Hospital, which resulted in the payment of

24   millions more dollars to the Hospital than that to which it was legally entitled.

25        59.    The false representations, records, statements, reports, and

26   certifications described herein were material to Medicare's decision to provide

27   reimbursement to the Hospital and had a natural tendency to influence and did

28   influence those decisions.

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 19 -

60.     As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false records, statements, and certifications made to the Medicare program and other monetary relief as appropriate.

### COUNT III
### FAILING TO REFUND OVERPAYMENTS OWED TO THE GOVERNMENT in violation of 31 U.S.C. § 3729(a)(1)(G)
### Claim By and on Behalf of the United States under the False Claims Act Against All Defendants

61.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 53 as though fully set forth herein.

62.     By virtue of the wrongful acts described herein, from 2002 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, received millions of dollars from Medicare to which they were not entitled and which they had an obligation to refund, but Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, failed to return this wrongfully-obtained money to Medicare. Defendants also concealed the false, misleading, and incomplete information included in the Hospital's Medicare cost reports, and never refunded, or offered to refund, any of the money wrongfully obtained. These actions violated 31 U.S.C. § 3729(a)(1)(G).

63.     The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions. In addition, Defendants' concealment of the false and fraudulent expenses impaired Medicare's ability to pursue refunds of the improperly paid amounts.

Second Amended Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

64.     As a result of these matters, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims, and other monetary relief as appropriate.

### PRAYER

WHEREFORE, Relator prays judgment against Hospital and Does 1 through 50, and each of them, as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3279 et seq.;

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3279 et seq.; for claims accruing after November 2, 2015, civil penalties increase of not less than $10,781.40 and $21,562.80 per violation of 31 U.S.C. § 3279 et seq.

3.     That the Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4.     That Relator be awarded all costs of this action, including attorneys' fees and expenses;

5.     That Relator recover other and further relief as the court shall deem appropriate.

DATED: 2/20/, 2018.     LAW OFFICE OF ESPERANZA CERVANTES
                        ANDERSON

                        By

                        _____
                        Esperanza Cervantes Anderson, Esq.
                        Attorney for Plaintiff/relator
                        FRANK ADOMITIS

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 21 -

Second Amended Complaint for Damages / Demand For Jury

1

2

3 **DEMAND FOR TRIAL BY JURY**

4          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby

5 demands a trial by jury.

6

7 DATED: 2/20 , 2018.        LAW OFFICE OF ESPERANZA CERVANTES

8                            ANDERSON

9 By:

10 _____
                               Esperanza Cervantes Anderson, Esq.
11                             Attorney for Plaintiff/relator
                               FRANK ADOMITIS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second Amended Complaint for Damages / Demand For Jury