## **EXHIBIT 5**

Excerpt from CMS State Operations Manual Chapter 2 - The Certification Process

# State Operations Manual
## Chapter 2 - The Certification Process

**Table of Contents**
*(Rev. 164, 11-04-16)*

**Transmittals for Chapter 2**

**Identification of Providers and Suppliers and Related Presurvey Activities**

2000 - Certification Surveys - Citations and Responsibility

2002 - Meaning of Providers and Suppliers

2003 - SA Identification of Potential Providers and Suppliers

2003A - Assisting Applicant Providers and Suppliers

2003B - Initial Certification "Kits"

2003C - Deemed Status Providers/Suppliers, Excluding CLIA

2004 - Provider-Based Determinations

2005 - Medicare Health Care Provider/Supplier Enrollment

2005A - Approval or Denial

    2005A1 - Enrollment Denial Based on MAC Review

    2005A2 - Approval or Denial of Certification Based on Survey Findings

    2005A3 - Reconsideration of Denial

    2005A4 - Deemed Providers/Suppliers, Excluding CLIA

2005B - Deemed Providers/Suppliers Except CLIA - Additional Information

2005C - Clinical Laboratory Improvement Amendments of 1988 (CLIA) Laboratories

2005D - Supplementary Applications

    2005D1 - Forms CMS-855A or the CMS-855B for Changes in Provider/Supplier Information

    2005D2 - Form CMS-855R

2005E - Changes of Ownership

    2005E1 - CHOW Occurs

    2005E2 - Change in Intermediary as Result of CHOW

    2005E3 - CHOWs Involving Multi-Regional Chain Organizations

    2005E4 - Change of Owners, but Not CHOW

2005F - Voluntary Terminations

2008 - Prioritizing SA Survey Workload - Initial Surveys and Recertifications

2008A - Surveys of New Providers and Suppliers

Exhibit 5 - 000001

2008B - Initial Surveys of HHAs

2008C - New CMHC Applicants

2008D - Effective Date of Medicare Provider Agreement or Approval for Suppliers

2008E - Administrative Considerations

2008F - SA Scheduling of Resurveys

2010 - Ascertaining Compliance With Civil Rights Requirements

2012 - SA Identifying Eligible Providers and Suppliers

2016 - Readmission to Medicare or Medicaid Program After Involuntary Termination - Reasonable Assurance

2016A - Readmission Criteria

2016B - Reasonable Assurance Concept

2016C - Request for Readmission

2016D - Reasonable Assurance Surveys

2016E - Effective Date of Provider Agreement After Reasonable Assurance

2016F - Readmission of ICF/IID After Termination

2016G - Under LSC at Time of Readmission

2017 - Readmission Following Voluntary Termination of Program Participation

2018 - Reinstatement Following Termination of Swing-Bed - Approval

## Hospitals

2020 - Hospitals - Definition and Citations

2021 – Non-deemed Hospitals

2021A – Recertification of Non-deemed Hospitals

2022 - Deemed Status: Hospitals Accredited by an Accrediting Organization with a CMS-approved Medicare Hospital or Medicare Psychiatric Hospital Accreditation Program

2022A - Notice that a Participating Hospital Has Been Accredited and Recommended for Deemed Status

2022B - Recertification

2022C - Notification of Withdrawal or Loss of Deemed Status Accreditation

2024 - Hospital Merger/Multiple Campus Criteria

2026 - Certification of Parts of Institutions as Hospitals

2026A - Hospitals (Other Than Psychiatric Hospitals)

2026B - Excluded Non-Service Units May be Appropriate

2030 - Temporary Waivers Applicable to Rural Hospitals

2034 - Time Limit on Temporary Waiver

2036 - Definition, Authority and Requirements for Hospital Providers of Extended Care Services ("Swing-Beds")

2037 - Requirements Assessed Prior to Survey for Swing-Bed Approval

Exhibit 5 - 000002

2037A - Request from a Medicare Participating Hospital to Add Swing-Bed Approval

2037B - Screening

2037C - Provider Agreement

2037D - Calculation of Bed Count

2037E - Rural Area

2037F - Certificate Of Need (CON) Approval

2038 - Survey Procedures for Swing-Bed Approval

2039 - Post-Survey Procedures for Swing-Bed Hospitals

2040 - RO Approval Procedures for Swing-Bed Approval

2042 - Psychiatric Hospitals

2044 - Psychiatric Hospitals and Deemed Status

2048 - Distinct Part Psychiatric Hospital

2048A - General

2048B - Physical Identification

2048C - Documentation of Findings

2050 - Medical-Surgical Unit of Psychiatric Hospitals

2052 - Nonparticipating Emergency Hospitals

2052A - Emergency Hospital Services

2052B - Preparation of Initial Certification

2052C - Recertification and Follow-Up

2053 - Medicaid-Only Hospitals

2053A - Initial Certification of Medicaid-Only Hospitals

2053B - Certification Surveys of Medicaid-Only Hospitals

2053C - Change in Certification

2053D - Termination

2053E - Complaint Investigation

2054 - Religious Nonmedical Health Care Institutions (RNHCIs)

2054.1 - Certification of Religious Nonmedical Healthcare Institutions (RNHCIs)

2054.1A - Other Medicare Conditions of Coverage

2054.1B - Valid Election Requirements

**Hospices**

2080 - Hospice - Citations and Description

2080A - Citations

2080B - Description

2080C - Hospice Core Services

2080C.1 - Waiver of Certain Staffing Requirements

2080C.2 - Contracting for Highly Specialized Services

2080C.3 - Hospice Nursing Shortage Provision

Exhibit 5 - 000003

2080D - Hospice Required Services

2080D.1 - Hospice Interdisciplinary Group (IDG)

2081 - Revoking Election of Hospice Care

2082 - Discharge from Hospice Care

2083 - Hospice Regulations and Non-Medicare Patients

2084 - Hospice Inpatient Services

2084A - Hospice Provides Inpatient Care Directly

2084B - Hospice Provides Inpatient Services Under Arrangements

2085 - Operation of Hospice Across State Lines

2086 - Hospice Change of Address

2086A - Effective Date

2086B - Administrative Review

2086C - Move After certification Survey

2087 - Simultaneous Surveys

2088 - Multiple Locations

2089 - Survey Requirements When the Hospice Provides Care to Residents of a SNF/NF or ICF/IID

### Intermediate Care Facilities

2130 - ICFs/IID – Citations and Description

2130A - Citations

2130B - Definitions

2134 - Distinct Part ICF/IID

2138 - Approval Procedures for ICFs/IID

2138A - Initial Certification of ICF/IID

2138B - Multiple Certification of Dispersed Locations

2138C - Minimum Size of ICF/IID

2138D - Interpretive Guidelines for ICFs/IID

2138E - Survey Report (Form CMS-3070G-I)

2138F - Application of LSC to ICFs/IID of 16 Beds or Less

2138G - Schedule for Recertification

2139 - Assessment of ICFs/IID Based on CoPs for Active Treatment

2139A - Comprehensive Functional Assessment

2139B - Individual Program Plan (IPP)

2139C - Program Implementation

2139D - Program Documentation

2139E - Program Monitoring and Review

2140 - Waiver and/or Variance of ICF/IID Requirements

2140A - ICF/IID Room Size and Occupancy

2140B - Waiver of LSC

Exhibit 5 - 000004

2141 - Recertifications  - ICFs/IID

2141A - Full  12 Months

2141B - Conditional  12 Month Agreement  Subject to Automatic  Cancellation
        Clause

2141C - Period of Certification  Which  Expires  60 Days After PoC

2141D - Extending  the Term of ICF/MR TLA

2142 - Evacuation  Drills  for ICFs/IID Certified  Under the Life Safety Code NFPA
101, 2000 Edition

2143 - The Use of Video  Cameras in Common  Areas in ICF/IID

## Spell of Illness Certifications

2160 - Purpose of Certifying  §§1861(e)(1) and 1819(a)(1) of the Act Status  of
Hospitals  and SNFs

2160A - Benefit  Period Provision

2160B - Defining  Medicare Eligible  Individual's  "Home" for Purposes of Durable
        Medical Equipment  (DME) and Home Health  Benefits

2160C - Defining  "Institution"  for Ambulance  Benefit

2162 - Defining  Hospital  for Spell of Illness,  DME, and Home Health  Benefit
Purposes

2164 - When to Make Spell of Illness  Certification

2166 - Criteria  for Certifying  §1819(a)(1) of the Act Status of LTC Facilities  Other
Than  SNFs

2166A - Nursing  Services

2166B - 24-Hour Nursing  Services

2166C - Nurse-Bed Ratio

2166D - Other Services

2168 - Additional  Development  Required  for Spell of Illness  Certifications

## Home Health Agencies (HHAs)

2180 - HHA – Citations  and Description

2180A - Citations

2180B - Types of Agencies

2180C - General  Requirements

2180D - Services  Provided

2180E – Application  of Home Health  Agency Conditions  of Participation  to
Patients  Receiving  Chore Services  Exclusively

2182 - Organization  of HHA

2182.1 - Characteristics  Differentiating  Branches  From Subunits  of HHAs

2182.2 - Guidelines  for Determining  Parent, Branch,  or Subunit

2182.3 - Processing  A Change  From Branch  to Subunit

2182.4 - CMS Approval  Necessary  for Non-Parent  Locations

Exhibit 5 - 000005

2182.4A - Notification by HHA to Add Non-Parent Location

2182.4B - SA Review of Requirement for Branch Determination

2182.4C - Onsite Monitoring of Approved Branches by the SA

2182.4D – Drop Sites

2182.5 - Branch Identification Numbers

2183 - Separate Entities (Separate Lines of Business)

2183.1 - Operation of the HHA

2183.2 - Consumer Awareness

2183.3 - Staff Awareness

2184 - Operation of HHAs Cross State Lines

2185 - HHA Change of Address

2185.1 - Move after Certification Survey and Before Final Medicare Approval

2186 - Health Facility-Based HHAs

2188 - Survey of State-Operated HHAs

2194 - Surveying Health Maintenance Organization (HMO)-Operated Home Health Agencies (HHAs) Providing Home Health Services Through Medicare Survey and Certification Process

2195 - Guidelines for Determining Standard Survey Frequency

2197 – Surveyor Worksheets

2202 - Outcome and Assessment Information Set (Oasis) Requirements

2202.1 - OASIS Related Definitions

2202.2 - History of OASIS

2202.2A - Current Version of OASIS

2202.2B - OASIS as Part of the HHA's Comprehensive Assessment

2202.2C - Incorporation of OASIS Data Items Into the Comprehensive Assessment (See §484.55(e))

2202.3 - Applicability

2202.3A - Medicare and Medicaid Patients

2202.3B - OASIS and the Medicare Home Health Benefit

2202.3C - Non-Medicare/Non-Medicaid Patients

2202.3D - Skilled Versus Nonskilled Care

2202.3E - Agencies Serving Medicaid Waiver and State Plan Patients

2202.3F - Patients Turning 18

2202.3G - Patients Receiving Maternity Services

2202.4 - Comprehensive Assessment and OASIS Reporting (Refer to §484.20 and §484.55)

Exhibit 5 - 000006

2202.4A - Comprehensive Assessment and OASIS Collection

2202.4B - OASIS Encoding and Locking

2202.4C - OASIS Reporting (Refer to §484.20)

2202.5 - Outcome-Based Quality Improvement (OBQI)

2202.5A - Using Outcome Based Quality Monitoring (OBQM) and Risk Adjusted OBQI Reports in the Survey Process

2202.5B - Case-Mix Stratified Sample

2202.5C - Privacy Act Requirements

2202.5D - Accessing the OBQM, OBQI, and Process Based Quality Improvement (PBQI) Reports

2202.5E - Role of the OASIS Coordinators in OBQI

2202.6 - OASIS Instructions

2202.6A - OASIS User's Manual

2202.6B - Other Manuals

2202.6C - Other Teaching Tools

2202.7 - OASIS and the Medicare Home Health Prospective Payment System (PPS)

2202.8 - Surveying for the OASIS Requirements

2202.8A - Condition of Participation: Comprehensive Assessment of Patients (See §484.55)

2202.8B - Record Keeping

2202.8C - Condition of Participation: Reporting OASIS Information

2202.8D - Condition of Participation: Release of Patient Identifiable OASIS Information

2202.9 - Patient Notification of OASIS Collection and Reporting

2202.9A - Informing Patients of OASIS Collection and Reporting

2202.9B - Right to See, Review, and Request Changes

2202.10 - OASIS and HHAs Seeking Initial Certification

2202.10A - Determining Compliance With the OASIS Transmission Requirements

2202.10B - HHAs Seeking Initial Certification Through Deemed Status

2202.10C - Exceptions to Demonstrating Compliance With OASIS Submission Requirements Prior to Approval

2202.10D - Compliance Dates and PPS

2202.10E - Instructions for Handling Medicare Patients in HHAs Seeking Initial Certification

Exhibit 5 - 000007

2202.10F - Instructions to New HHAs Concerning all Other Patients

2202.11 - Correction Policy

2202.11A - Determining When to Inactivate an Assessment

2202.11B - Deleting Assessments

2202.11C - Types of Corrections an HHA Can Make in HAVEN

2202.11D - Documentation of Corrected Assessments

2202.11E - Clinical Implications of Corrected Assessment Records

2202.11F - Regarding Corrections in Lieu of Required Assessments

2202.11G - Timeliness of Corrections

2202.11H - Multiple Corrections in a Record

2202.12 - OASIS State System

2202.12A - System Description

2202.12B - Administration Requirements

2202.12C - Validation and Editing Process

2202.12D - Reports

2202.12E - Replication to the CMS Repository

2202.12F - System Security

2202.12G - Security of Transmission

2202.12H - Provider Relations

2202.13 - Protection of the Confidentiality of OASIS Data

2202.13A - OASIS System of Records

2202.13B - Protection of Confidentiality Under the Privacy Act of 1974

2202.14 - SA and RO Roles and Responsibilities

2202.14A - State

2202.14B - Regional Office

2202.15 - OASIS Education and Training

2202.15A - State

2202.15B - RO

2202.15C - HHAs

2202.16 - Fax Transmission of OASIS or Other Patient Identifiable Information

2202.17 - Change of Ownership (CHOW), Merger, and Termination Procedures Affecting HHAs and OASIS Requirements

2202.18 - Wound Ostomy Continence Nurses Society (WOCN) and the National Pressure Ulcer Advisory Panel (NPUAP) OASIS Guidance

2202.19 - OASIS Collection on Private Pay (Non-Medicare/Non-Medicaid)

Exhibit 5 - 000008

Patients

## Ambulatory Surgical Centers (ASCs)

2210 - ASCs - Citations and Description

## Rural Health Clinics (RHCs)

2240 - RHCs - Citations and Description

2242 - Conditions to Be Assessed Prior to Scheduling RHC Survey

2242A - General

       2242A1 - Location of Clinic

       2242A2 - Medical Direction

       2242A3 - Physician Assistant, Nurse Practitioner, and/or Certified Nurse Midwife Staff

2242B - Clinic Is Determined Ineligible

2242D - Identifying Clinic as Provider-Based

2242E - Compliance With Civil Rights Statutes

2242F - Laboratory Services Provided in RHCs

2244 - Preparing for RHC Survey

2246 - Clinic's Request to Provide Visiting Nurse Services

2248 - Clinic's Request for Waiver of Staffing Requirements

2248A - Applying Waiver to Applicants

2248B - Applying Waiver to Participating RHCs

2248C - Documentation Demonstrating Efforts to Meet Staffing Requirements

2248D - Monitoring Waivers

2248E - Notification

2249 - RO Notification of RHC Initial Certification Approval

## Community Mental Health Centers

2250 - Community Mental Health Centers (CMHC) - Citations and Descriptions

2250A - General

2250B - Special Requirements

2250C - Community Mental Health Centers

2250D - Partial Hospitalization Program (PHP)

2250E - Partial Hospitalization Services Provided by CMHCs or by Others Under Arrangements With the CMHC

2250F - Definitions of Core Services

2250G - Threshold and Service Requirements for CMHCs

2250H - Revisions to the Core Service Screening Requirements as the Result of the Passage of BIPA

2252 - Certification Process

Exhibit 5 - 000009

2252A - General

2252B - Request to Participate

2252C - Information to be Sent to CMHC Applicant

2252D - Processing CMHC Requests, FI Role

2252E - Processing CMHC Requests, SA Role

2252F - Processing CMHC Requests, RO Role

2252G – Onsite Visit to the CMHC

2252H - Facility Alleges it is Provider-Based

2252I - Facility Requests an Alternative Site to be Approved Initially or Subsequent to Approval

2252J - RO Approval of CMHC Request for Medicare Approval

2252K - RO Denial of CMHC Request for Medicare Approval

2252L - Approved Provider Changes Ownership

> 2252L1 - Provider Agreement is Assigned, FI Role
>
> 2252L2 - Provider Agreement is Assigned, SA Role
>
> 2252L3 - Provider Agreement is Assigned, RO Role
>
> 2252L4 - Approved Provider Changes Ownership, Provider Agreement Is Not Assigned

2252M - Voluntary Termination

2252N - Involuntary Termination

2252O - Identifying the "Most Egregious" CMHCs for Termination Action

2252P - For Visits to Existing Medicare CMHCs

> Attachment A - Community Mental Health Center Notification and Approval of Address Change
>
> Attachment B -Community Mental Health Center Site Visit Request Form

**Critical Access Hospitals (CAHS)**

2254 - CAHS (Critical Access Hospitals)

2254A - Statutory Citation

2254B - Regulatory Citation

2254C - Submission of a State Plan

2254D - Requirements for Critical Access Hospitals

2255 - SA Procedures for CAH Approval

2255A - CAH Applications

2255B - Pre-Survey Activity

2255C - Arranging a CAH Survey

2255D - Onsite Survey Activity

2255E - Preparing a Statement of Deficiencies

2256 - RO Procedures for CAH Approval

Exhibit 5 - 000010

2256A - Verification  Criteria

2256B - Notification

2256C - Effective  Dates

2256D - RO Processing  Complaints  Against  a CAH

2256E - RO Processing  Denials  or Terminations  of a CAH

2256F - Relocation  of CAHs with a Grandfathered  Necessary Provider Designation

2256G – Co-Location of Critical  Access Hospitals

2256H – Off-Campus  CAH Facilities

2257 - CAH Anti-Dumping  Requirements

2258 - Advance  Directive  Requirements  for CAHS

2259 - Procedures for Processing  CAH Swing-Bed  Applications

2259A - Definition,  Authority  and Requirements  for CAH Providers  of Extended Care Services  ("Swing-Beds")

2259B - Request from a Medicare Participating  CAH to add Swing-bed  Approval

2259C - Pre-Survey  Activity

2259D - Certificate  Of Need (CON) Approval

2260 - Survey  Procedures for Swing-Bed  Approval

2261 - Post-Survey  Procedures for Swing-Bed  CAHS

2262 - RO Approval Procedures for Swing-Bed  Approval


**End Stage Renal Disease (ESRD) Facilities**

2270 - ESRD Citations

2272 - Types of ESRD Facilities

2272A - Renal Transplantation  Center

2272B - Renal Dialysis  Center

2272C - Renal Dialysis  Facility

2272D - Self-Dialysis  Unit

2274 - ESRD Application  Requirement

2276 - SA Control of Form CMS-3427

2278 - ESRD Survey  Procedures

2278A - Facility  Withdraws  Application  Prior to Survey

2278B - Conducting  SA Survey

2278C - Certificate  of Need (CON)

2278D - Initial  RO Approval

2278E - Expansion  or Addition  of Services  - RO Procedures

2278F - RO Recertification

2278G - Invalid  Application

2280 - RO Facility  Classification  (42 CFR 405.2122)

2280A - Renal Transplantation  Center (RTC)

Exhibit 5 - 000011

Exhibit 5 - 000012

# Critical Access Hospitals (CAHS)

## 2254 - CAHS (Critical Access Hospitals)

**(Rev. 1, 05-21-04)**

## 2254A - Statutory Citation

**(Rev. 1, 05-21-04)**

Section 4201 of the Balanced Budget Act of 1997, Public Law 105-33, amended §1820 of the Social Security Act and created the Medicare Rural Hospital Flexibility Program (MRHFP). The program allows for the creation of critical access hospitals and is designed to promote rural health planning, network development, and improve access to health services for rural residents of the State. The program is available in any State having rural facilities and which chooses to set up such a program and submits an acceptable State plan to CMS.

## 2254B - Regulatory Citation

**(Rev. 1, 05-21-04)**

The Conditions of Participation (CoPs) for Critical Access Hospitals are found in the Code of Federal Regulations at 42 CFR Part 485 subpart F.

## 2254C - Submission of a State Plan

**(Rev. 1, 05-21-04)**

States who are interested in establishing CAHS must submit an application to the Regional Administrator of the CMS Regional Office responsible for oversight of Medicare and Medicaid in the State. An official of the State must sign the application. The application must express the State's interest in developing a MRHFP. There are no Federal forms and no set format for the submission of the State plan. The State plan should designate facilities in the State that qualify for critical access hospital status. There is no statutory or regulatory requirement for CMS to review changes or updates to any State plan subsequent to the initial review and acceptance by CMS.

## 2254D - Requirements for Critical Access Hospitals

**(Rev. 1, 05-21-04)**

A critical access hospital is a facility that is designated as a CAH by the State in which it is located and meets the following criteria:

Exhibit 5 - 000013

- Meets the Conditions of Participation found at <u>42 CFR Part 485 subpart F</u>;

- Is a rural public, non-profit or for-profit hospital; or is a hospital that was closed within the previous ten years; or is a rural health clinic that was downsized from a hospital;

- Is a facility located in a State that has established a State plan with CMS for the Medicare Rural Hospital Flexibility Program;

- Is located more than a 35-mile drive from any other hospital or CAH (in mountainous terrain or in areas with only secondary roads available, the mileage criterion is 15 miles); **or** is certified by the State in the State plan as being a **necessary provider** of health care services to residents in the area;

- Makes available 24-hour emergency care services 7 days per week;

- Provides not more than 15 beds for acute (hospital level) inpatient care. An exception to the 15-bed requirement is made for swing-bed facilities, which are allowed to have up to 25 inpatient beds that can be used interchangeably for acute or SNF-level care, provided that not more than 15 beds are used at any one time for acute care;

- Provides an annual average length of stay of 96 hours per patient for acute care patients;

**NOTE:** An exception has been made by CMS for hospice admissions to a CAH. The hospice may contract with a CAH to provide the hospice hospital benefit. Reimbursement from Medicare is made to the hospice. The CAH may dedicate beds to the hospice but the beds must be counted as part of the allowable number of CAH beds. The hospice patient does not contribute to the 96-hour annual average length of stay computation. The hospice patient can be admitted to the CAH for any care involved in their treatment plan or for respite care. The CAH negotiates reimbursement through an agreement with the hospice.

## 2255 - SA Procedures for CAH Approval

**(Rev. 1, 05-21-04)**

A CAH must be surveyed for compliance with the CoPs in <u>42 CFR Part 485 subpart F</u>, and compliance with the specific CAH SNF requirements specified by <u>42 CFR 485.645(d)</u> if it has or is requesting swing-bed approval.

## 2255A - CAH Applications

**(Rev. 1, 05-21-04)**

When a facility contacts the SA to apply for Medicare participation as a CAH, the SA

Exhibit 5 - 000014

sends a letter to the CAH, see (Exhibit 134) "Transmitting Materials to Critical Access Hospitals."

A current Medicare provider who is requesting a change of status to a CAH sends an amended Form CMS-855A to the FI with specific information required by the FI.

Within 30 days, the intermediary will notify the SA indicating if the Form CMS-855A was approved or not approved. The State survey agency verifies that the facility has been properly designated as a CAH by the State government entity responsible for CAH designation prior to forwarding the application to the RO.

## 2255B - Pre-Survey Activity

**(Rev. 1, 05-21-04)**

The SA follows the procedures outlines in Appendix W, Survey Protocol for CAH Providers. The SA verifies requirements in the CAH CoPs in 42 CFR 485.608, 485.610, and 485.612 from facility files and any other documentation available at its office. If the prospective CAH has swing-bed approval, the SA determines that the swing-bed approval is current.

## 2255C - Arranging a CAH Survey

**(Rev. 1, 05-21-04)**

After the RO has authorized a survey, the SA follows the procedures outlined in Appendix W, Survey Protocol for CAH Providers. All CAH surveys are unannounced surveys.

## 2255D - Onsite Survey Activity

**(Rev. 1, 05-21-04)**

The SA follows the guidelines for the survey process in Appendix W.

## 2255E - Preparing a Statement of Deficiencies

**(Rev. 1, 05-21-04)**

The SA uses the "Statement of Deficiencies and Plan of Correction," Form CMS-2567, when citing deficiencies, and refers to Exhibit 7A, "Principles of Documentation," for procedural guidance. The SA sends the completed Form CMS-2567 to the facility. If there are deficiencies cited, the SA sends a letter, see Exhibit 151, "Request for a Plan of Correction Following an Initial CAH Survey." If there are swing-bed deficiencies, a separate Form CMS-2567 must be prepared.

## 2256 - RO Procedures for CAH Approval

Exhibit 5 - 000015

**(Rev. 1, 05-21-04)**

A prospective CAH must be surveyed by the SA and be in compliance with the CoPs for CAHS at 42 CFR Part 485 subpart F, before it can be approved for participation in Medicare as a CAH provider. The change from hospital to CAH is considered a change in status. A new provider agreement is not needed unless there is a change in ownership (CHOW) without the assumption of debt.

## 2256A - Verification Criteria
**(Rev. 143, Issued: 07-31-15, Effective: 07-31-15, Implementation: 07-31-15)**

If the provider is a hospital, CAH verification requires that the RO review the facility file to determine if the prospective CAH is in compliance with the hospital CoPs in 42 CFR Part 482 at the time it made application for designation as a CAH (see 42 CFR 485.612). If the provider is a closed hospital or a downsized hospital, it is not necessary that they meet hospital CoPs at the time of application or on conversion.

The RO will reverify compliance with 42 CFR 485.610(a) and (b) and has primary responsibility to verify compliance with 42 CFR 485.610(c) and (d).

**NOTE**: A hospital applying for CAH certification should **not** be surveyed until after the RO determined that the applicant is compliant with the CAH location and distance requirements. If the survey is conducted prior to the RO making a determination regarding the applicant's compliance with the location and distance requirements, and the RO finds that the applicant is noncompliant, the application must be denied. The applicant may submit a reapplication for CAH certification in connection with the initial enrollment application – using the guidance in Chapter 2 of the SOM, §2005A2.

**Rural location**

Among other requirements, pursuant to 42 CFR 485.610(b), all CAH applicants and existing CAHs, including necessary provider CAHs, must either be:

- Located in a rural area; or
- Treated as rural in accordance with 42 CFR 412.103

in order to be eligible for CAH designation and certification.

Only the CMS Regional Office makes the determination whether a CAH applicant or existing CAH meets the rural location requirement, following the instructions below. However, State Survey Agencies (SA) may wish to make informal assessments prior to conducting a survey. If the SA's informal assessment suggests the CAH applicant or existing CAH is not rural, it should consult with the RO before conducting a survey.

- **Located in a rural area – i.e., outside a Metropolitan Statistical Area (MSA)**

Exhibit 5 - 000016

Under 42 CFR 485.610(b)(1)(i), a rural area is any area that is outside a MSA, as defined by the Federal Office of Management and Budget (OMB). In making a determination regarding the rural status of a CAH, the CMS RO first consults the latest OMB MSA delineations that have been adopted by CMS.

OMB conducts a comprehensive review of its MSA delineations once a decade and also conducts periodic updates between decennial censuses based on Census Bureau data. When OMB releases revised statistical area delineations, typically CMS adopts the new delineations in the next hospital Inpatient Prospective Payment System (IPPS) rule, which is usually proposed in April of each year, published as a final rule in August and effective on October 1st following the final rule publication date. If an IPPS final rule has been released during a time when OMB has not released revised statistical area delineations, the most recently-released OMB delineations adopted by CMS remain in effect. Accordingly, the RO must consult the MSA delineations used for the purpose of the final IPPS rule that is in effect at the time of:

- The Medicare Administrative Contractor's (MAC) determination that a hospital has submitted a complete application to convert to CAH certification; or
- At the time of the RO's recertification review of an existing CAH.

The most recent final IPPS rules can be found on CMS' Acute Inpatient PPS webpage:

http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/index.html

ROs may use the following instructions to locate the OMB MSA delineations in effect at the applicable time for a rural location determination:

1. Go to the Acute Inpatient PPS webpage noted above.
2. Select the link for the IPPS final rule in effect at the applicable time for the initial applicant or at the time of the recertification decision for an existing CAH. For example, if a CAH is up for recertification and the RO is evaluating the CAH's compliance with the rural location requirement on February 1, 2016, the most recent OMB MSA delineations adopted by CMS would be those effective October 1, 2015 and the RO would select "FY 2016 IPPS Final Rule Home Page" from the list of IPPS rules on the left-hand column. On the other hand, if the RO is evaluating the existing CAH's compliance on September 10, 2015, it would select the FY 2015 IPPS Final Rule Home Page, since the FY 2016 rule would not go into effect until October 1, 2015.
3. Select the link for final rule data files. For example, on the FY 2015 IPPS Final Rule Home Page, select the link titled "FY 2015 Final Rule Data Files."
4. In the Downloads section at the bottom of the page, select the link for the "County to CBSA Crosswalk File."
5. Select the Excel file. For example, for the FY 2015 IPPS final rule, select the file titled "CBSAtoCountycrosswalk_FY15_FR.xlsx."

Exhibit 5 - 000017

6. Search for the county in which the CAH is located. If the IPPS rule has adopted revised OMB statistical delineations, the revised information will be found in column "G", which is titled, "New CBSA" (Blanks are Rural)." Column G includes the CBSA code for each county. If the cell is blank, the county is a rural county. If all of Column G is blank, this means that the final IPPS rule did not include adoption of revised OMB statistical delineations, and that the delineations from a prior final rule remain in effect.

- **Even if the existing CAH or CAH applicant is located outside an MSA and therefore is in a rural area, it is also necessary to determine that it is also <u>not</u>:**

  - Located in an area that has been recognized as urban in accordance with 42 CFR 412.64(b), excluding §412.64(b)(3);
  - Classified as an urban hospital in accordance with 42 CFR 412.230(d) (NOTE: 42 CFR 412.230(d) became 412.230(d) in 2001); or
  - Redesignated to an adjacent urban area in accordance with 42 CFR 412.232.

  Financial staff in the RO should be able to provide information on whether the CAH applicant falls in one of the above three categories, since 42 CFR Part 412 are regulations developed primarily for payment purposes.

- **Located within an MSA, but treated as rural**

  Even if the CAH applicant is located in an MSA, it may nevertheless qualify to be "treated" as rural if it is a hospital that has been reclassified as rural in accordance with 42 CFR 412.103, i.e., it was reclassified based on:

  - Being located in a rural census tract of a MSA per the most recent version of the Goldsmith Modification or the Rural-Urban Commuting codes, as determined by the Office of Rural Health in the Health Resources and Services Administration. (See http://www.hrsa.gov/ruralhealth/policy/definition_of_rural.html);

  Or

  - It would qualify as a rural referral center or a sole community hospital if it were located in a rural area;

  Or

  - It is located in an area designated under any State law (including State regulation) as a rural area, or has been designated as a rural hospital under State law (including regulation).

Rural reclassifications are handled by the CMS RO Office of Financial Management. RO survey and certification staff should consult with their financial management counterparts

Exhibit 5 - 000018

to determine whether a reclassification has been made that would permit a CAH applicant or existing CAH to be treated as rural.

**In the case of an initial application for CAH status** by a hospital, the application must be denied if the hospital applicant is located within an MSA or has not been reclassified in a manner that allows it to be treated as rural. If the applicant subsequently succeeds in being reclassified as rural, it may submit a reapplication for CAH certification in connection with the initial enrollment application – using the guidance in Chapter 2 of the SOM, §2005A2 – on or after the effective date of its reclassification . If the hospital was surveyed for compliance with the CAH CoPs as part of its prior denied application, it must nevertheless be surveyed again; however, this survey does not require an on-site visit if the hospital is otherwise in substantial compliance with the CAH CoPs. (NOTE: This should be a rare occurrence as a hospital applying for CAH certification should **not** be surveyed until the RO has determined that the applicant is in compliance with the CAH location and distance requirements). The effective date of its CAH conversion must be no earlier than the date when the applicant demonstrates compliance with all requirements to be certified as a CAH.

**In the case of an existing CAH that is being recertified**, the RO first determines whether the CAH is outside of an MSA, using the OMB MSA delineations adopted by CMS and in effect at the time the RO is processing the CAH's recertification. If the CAH is no longer outside an MSA, the RO must consult with the RO Office of Financial Management to determine whether there is a reclassification in effect that permits the CAH to be treated as rural.

If the existing CAH previously was outside an MSA, but is now in an MSA and has not been reclassified as rural, the CAH may continue to retain its CAH status up to two years after the effective date of CMS's adoption of the OMB MSA delineations that changed the CAH's rural status. The CAH is responsible at all times for ensuring that it meets the requirement at §485.610(b) to be considered rural. Therefore, in order to continue participating in the Medicare program, during the two-year grace period the CAH is expected either to successfully be reclassified to be treated as rural or to have completed conversion to a Medicare-certified hospital, including demonstrating compliance with the hospital CoPs at 42 CFR Part 482. Note that a recertification review of the CAH's status and location by the RO is triggered any time:

- An SA conducts a full survey of a CAH, whether for recertification of a non-accredited CAH, for a validation survey of a deemed status CAH, or when following up on a prior complaint survey and the RO requires a full survey; or

- An accrediting organization reaccredits a deemed status CAH and recommends to the RO continued deemed status.

If the recertification review of the CAH takes place more than two years after the effective date of the CMS adoption of revised OMB MSA delineations that resulted in the CAH's loss of rural status and the CAH has not been reclassified to be treated as rural, the CAH is

Exhibit 5 - 000019

substantially noncompliant with the CAH Status and Location CoP (§485.610) and the RO takes action to terminate the CAH's Medicare agreement.

**Examples:**

- Example 1: The RO is conducting a recertification review of a CAH in January, 2016. When CMS initially certified the CAH, it determined that the CAH was located outside of an MSA. However, for the purposes of this example, the OMB MSA delineations that were adopted by CMS and effective October 1, 2014 resulted in the CAH being located within an MSA. The CAH had a maximum of two years – up to and including October 1, 2016 - to retain its CAH certification status. However, the CAH did not seek reclassification to be treated as rural. After conducting its January 2016 review, the RO would notify the CAH that it no longer satisfies the CAH rural status requirement and could remain certified as a CAH only until October 1, 2016. The CAH would then have 10 months to either be reclassified as rural or to complete conversion to CMS-certified hospital status in order to avoid termination of its Medicare agreement.

- Example 2: The CAH in Example 1 was not reviewed for recertification until January 2017, a date more than two years after the effective date of its changed MSA status. Additionally, the CAH had not been reclassified as rural and had not converted to hospital certification. In this situation, the CMS RO would determine that the CAH does not satisfy the CAH rural status requirement and would take action to terminate the CAH's Medicare agreement.

- Example 3: For the purposes of this example only, revised OMB MSA delineations were released in May 2014, proposed for adoption by CMS as part of the IPPS rule in April 2015, adopted by CMS August 8, 2015, and became effective October 1, 2015. Furthermore, a MAC determined that an initial CAH applicant's application was complete and could be recommended to the RO and SA for approval as of June 5, 2015, contingent upon the CAH being certified by CMS. Also the CAH applicant was recommended for deemed status by a CMS-approved Medicare CAH accreditation program, with an August 15, 2015 accreditation effective date. In this case, the RO would use the OMB MSA delineations that CMS had most recently adopted as of June 5, 2015, i.e., those adopted by CMS effective October 1, 2014, in making its determination about rural status, and found that the CAH was outside an MSA and certified it as a CAH effective August 15, 2015. The RO does this even though OMB released more recent delineations in May 2014 and CMS has already adopted a rule incorporating the later OMB MSA delineations. Since the adoption of the later delineations is not effective until October 1, 2015, the RO must use the MSA delineations previously adopted by CMS and applicable on June 5, 2015.

- Example 4: Finally, using the CAH in Example 3, the CAH is now located inside an MSA based on revised OMB MSA delineations adopted by CMS effective October 1, 2015. As a result, the CAH no longer meets the rural location requirement as of October 1, 2015, but may retain its CAH status until October 1, 2017. Note that in this case the CAH is not due for reaccreditation and recertification until August 2018,

Exhibit 5 - 000020

which is after the end of the grace period. If the CAH has neither been successfully reclassified as rural nor converted to a hospital by October 1, 2017, the RO would take action to terminate the CAH's Medicare agreement.

In all of the above examples, the CAH has primary responsibility for monitoring changes in its rural status resulting from CMS's adopted revised OMB MSA delineations, and taking appropriate action if it loses its rural status on the basis of the revised delineations.

**Necessary Provider Status and Rural Reclassification**

Necessary provider certification only provides an exemption from the CAH distance requirements relative to other CAHs and hospitals. Necessary provider CAHs are still required to meet the rural location requirement; therefore, if a necessary provider CAH is located within an MSA as a result of a change in the OMB MSA delineations adopted by CMS, it must follow the same procedures noted above as any other CAH.

**Location relative to other facilities or necessary provider certifications:**

In addition, the regulations at 42 CFR 485.610(c) specify that one of the following 3 minimum driving distances from other facilities requirements must be met:

- <u>35-Mile Distance</u>: The CAH must be located more than a 35-mile drive from any hospital or other CAH; or

- <u>15-Mile Distance</u>: In the case of mountainous terrain or in areas with only secondary roads available, the CAH must be located more than a 15-mile drive from any hospital or other CAH; or

- <u>No Distance Requirement</u>: In the case of a CAH that was designated by the State as being a necessary provider of health care services to residents in the area before January 1, 2006, there is no minimum distance requirement.

In determining whether a currently certified CAH or a CAH applicant meets the location requirements at §485.610(c), the proximity of IHS/Tribal hospitals or CAHs and non-IHS/Tribal hospitals or CAHs to each other is not considered.

The following examples clarify how determinations are to be made when IHS or Tribal hospitals or CAHs are in the vicinity of non-IHS or non-Tribal hospitals or CAHs:

- Example 1: Hospital A is seeking CAH certification and is a 10-mile drive from Hospital B, an IHS hospital. Hospital C is the next nearest hospital/CAH and is a 42-mile drive from Hospital A. The distance to Hospital B is not considered; Hospital A meets the minimum distance to another CAH or hospital requirement.

- Example 2: CAH A is a tribal facility that is being reviewed as part of the recertification process. It is a 17-mile drive from a non-tribal/non-IHS CAH (CAH B). It is also a 75-mile drive from an IHS hospital (Hospital C). The distance to CAH B is

Exhibit 5 - 000021

not considered; CAH A continues to meet the minimum distance to another CAH or hospital requirement.

- Example 3: Hospital A is a tribal hospital seeking CAH certification and is a 33-mile drive along primary roads to an IHS hospital, Hospital B. It is also a 50-mile drive to Hospital C, a non-IHS/non-tribal hospital. The distance to Hospital B is considered; Hospital A does not meet the minimum distance to another CAH or hospital requirement.

If a CAH is located on an island and the location meets the following characteristics, the CAH is considered to be in compliance with the distance requirements relative to other hospitals and CAHs under §485.610(c):

- The island is entirely surrounded by water;
- The CAH is the only hospital or CAH on the island; and
- The island is not accessible by any roads.

CAHs located on islands that meet the criteria above are still required to comply with the rural location requirement under §485.610(b).

In demonstrating that it meets the standard for more than a 35-mile drive, a CAH applicant must document that there is no driving route from the applicant to any other CAH or hospital that is 35 miles or less in length.

**Application of the more than 15-mile drive standard, based on mountainous terrain**

Slope and ruggedness of the terrain around the CAH, together with absolute altitude (the distance above sea level), determine many of the fundamental characteristics of mountainous terrain.[1] However, being located at a high elevation does not, in and of itself, constitute "mountainous terrain," nor does being located at the foot of a mountain or where mountains can be viewed. Further, the absolute altitude required to constitute mountainous terrain will vary in different regions. For example, the altitude of the Appalachian Mountains is considerably lower than that of the Rocky Mountains, yet the slope and ruggedness of the terrain in many portions of the Appalachians is mountainous. Furthermore, roads passing through mountainous terrain are characterized by certain typical engineering features. For the purposes of determining a CAH's eligibility for the 15-mile drive standard based on mountainous terrain, the roads on the travel route(s) to hospitals or other CAHs must meet the following criteria:

- Over 15 miles of the roads on the travel route(s) from the CAH to any hospital or another CAH must be located in a mountain range, identified as such on any official maps or other documents prepared for and issued to the public; **and**

---

[1] United Nations Environment Programme World Conservation Monitoring Centre. (2002). *Mountain Watch*. Retrieved August 11, 2010, from http://www.unep-wcmc.org/mountains/mountain_watch/pdfs/.

Exhibit 5 - 000022

- Since being located within a mountain range in and of itself does not mean that the drive to any other hospital or CAH includes travel through "mountainous terrain," the roads on the travel route(s) from the CAH to any other hospital or CAH must have either of the following characteristics:

  - Extensive sections of roads with steep grades (i.e., greater than 5 percent), continuous abrupt and frequent changes in elevation or direction, or any combination of horizontal and vertical alignment that causes heavy vehicles to operate at crawl speeds for significant distances or at frequent intervals.[2] (Horizontal alignment refers to the "straightness" of the roadway, vertical alignment refers to the roadway's "flatness," and crawl speed is the speed at which a truck has no power to accelerate on long, steep grades.[3,4] Thus, roads in mountainous terrain are commonly described as winding and steep);

  or

  - Be considered mountainous terrain by the State Transportation or Highway agency, based on significantly more complicated than usual construction techniques that were originally required to achieve compatibility between the road alignment and surrounding rugged terrain. For example, because the changes in elevation and direction are abrupt in mountainous terrain, roadbeds may require frequent benching, side hill excavations, and embankment fills.[5]

A letter from the State Transportation or Highway agency specific to the travel route(s) in question is required to support the claim of mountainous terrain based on either of these sets of road characteristics.

It is not uncommon for there to be roads (or sections of roads) through mountainous areas that do not meet the criteria for "mountainous terrain." A CAH would qualify for application of the mountainous terrain criterion if there is a combination of mountainous and non-mountainous terrain between it and any other hospital or CAH, so long as there is no route to any hospital or other CAH with 15 or fewer miles of roads in mountainous terrain. When calculating the mountainous terrain travel distance to any hospital/other CAH, subtract the total distance represented by those sections of the travel route that are not considered "mountainous terrain." For example, if the route to the nearest hospital consisted of 12 miles in mountainous terrain, followed by 5 miles in non-mountainous terrain, followed by 4 miles in mountainous terrain, then the requirement for a total of more than 15 miles would be met (12 miles plus 4 miles – or 21 miles minus 5 miles – yield 16 total miles of mountainous terrain).

---

[2] Mannering, F. L., Washburn, S. S., & Kilareski, W. P. (2009). *Principles of Highway Engineering and Traffic Analysis.* Hoboken, NJ: John Wiley and Sons, Inc

[3] *Highway Capacity Manual: 2000 (U. S. Customary Units)* by Transportation Research Board (Dec. 2000). p 23-9.

[4] Donnell, E. T., Ni, Y., Adolini, M., & Elefteriadou, L. (2001). *Speed prediction models on two-lane rural highways.* Transportation Research Record, 1751, 44-55.

[5] *Mannering, F. L., Washburn, S. S., & Kilareski, W. P. (2009). Principles of Highway Engineering and Traffic Analysis. Hoboken, NJ: John Wiley and Sons, Inc.*

Exhibit 5 - 000023

**Application of the more than 15-mile drive standard, based on secondary roads**

To be eligible for the lesser distance standard due to the <u>secondary road criteria</u> under §485.610(c) the CAH must document that there is a drive of more than 15 miles between the CAH and any hospital or other CAH where there are no primary roads. A primary road is:

- Any US highway, including any road:
    - In the National Highway System, as defined in 23 US Code §103(b); or
    - In the Interstate System, as defined in US Code §103(c); or
    - Which is a US-Numbered Highway (also called "US Routes" or "US Highways") as designated by the American Association of the State Highway and Transportation Officials (AASHTO), regardless of whether it is also part of the National Highway System;

    All US highways are readily identified via signage along the roads and on maps by the presence of "US" or "I" above the highway number, with the letters and number appearing on a distinctive, uniform shield background that is called the six point shield, with five points above and one below.  Note: Although the National Highway System and the U.S. Numbered Highway system largely overlap, they are not identical.  According to the American Association of the State Highway and Transportation Officials (AASHTO), which is responsible for designation of roads in the U.S. Numbered Highway system, the system is intended to facilitate the movement of interstate traffic in two or more States with the use of uniform markings.[6]

    Given the role all US highways are intended to play in interstate commerce, they are, by definition, primary roads.

  OR

- A numbered State highway with 2 or more lanes each way;

OR

- A road shown on a map prepared in accordance with the U.S. Geological Survey's Federal Geographic Data Committee (FGDC) Digital Cartographic Standard for Geologic Map Symbolization as a "primary highway, divided by median strip."

A CAH may qualify for application of the "secondary roads" criterion if there is a combination of primary and secondary roads between it and any hospital or other CAH, so long as more than 15 of the total miles from the hospital or other CAH consists of areas in which only secondary roads are available.  To apply the secondary roads criterion, measure the total driving distance between the CAH and each hospital or CAH located within a 35-mile drive and subtract the portion of that drive in which primary roads are

---

[6] *AASHTO Special Committee on U.S. Route Numbering. Retrieved June 17, 2014, from: http://route.transportation.org/Documents/HO1_Policy_Establ_Develop_USRN.pdf*

Exhibit 5 - 000024

available.  If the result is more than 15 miles for each drive to a hospital or CAH facility, the 15-mile criterion is met.

The RO will review Web-based map servers, such as Google Maps, or NationalAtlas.gov for example, to determine whether the provider meets the requirements of 42 CFR 485.610(c).  The RO will also review any documentation the provider may submit to demonstrate that it meets either the mountainous terrain or secondary roads criterion of §485.610(c), but such documentation must satisfy the requirements discussed above.  For example, CMS does not consider any issues raised by CAH applicants or other parties concerning the physical features of any specific US highway, or portion thereof, when making a CAH location determination.  Therefore, documentation submitted by the applicant indicating that a particular portion of a US highway has numerous curves, or a weight limitation, or narrow shoulders, etc. would not affect the RO's determination that the highway is a primary road.

## 2256B - Notification

**(Rev. 1, 05-21-04)**

When the facility is found to be in full compliance with the CoPs in 42 CFR Part 485, Subpart F, or has submitted an acceptable Plan of Correction, the RO notifies the facility in writing by sending letter, see Exhibit 150, "CAH Approval Notification," stating the facility has been approved for participation.  A copy of the notice letter is sent to the FI and SA.  Do not issue the letter until the facility is in compliance with all the CoPs.

## 2256C - Effective Dates

**(Rev. 1, 05-21-04)**

After the RO has reviewed and approved the SA recommendation for Medicare participation, the effective date for participation by a CAH will be one of the following:

- The last date of the initial survey by the SA, provided the prospective CAH is in full compliance with the CAH CoPs on that date; or

- The date that the prospective CAH submits an acceptable plan of correction to the SA.

## 2256D - RO Processing Complaints Against a CAH

**(Rev. 1, 05-21-04)**

When the RO or SA receives a complaint against a CAH regarding the CoPs in 42 CFR Part 485 subpart F, including the SNF requirements for a swing-bed CAH, the RO follows the normal complaint process for non-accredited hospitals.

## 2256E - RO Processing Denials or Terminations of a CAH

Exhibit 5 - 000025

**(Rev. 1, 05-21-04)**

When the RO processes a denial or termination of a CAH, it follows the normal procedures that apply to Medicare-participating hospitals. For CAH denials, the RO uses a letter, see Exhibit 149, "CAH Denial for Medicare Participation Letter"; for CAH terminations use a letter, see Exhibit 152, "CAH Termination Letter."

## 2256F - Relocation of CAHs With a Grandfathered Necessary Provider Designation

**(Rev. 32, Issued: 01-18-08, Effective: 09-07-07, Implementation: 09-07-07)**

The intent of the CAH program is to keep hospital-level services in rural communities, thereby ensuring access to care, through provision of reimbursement on a more favorable basis than that available to participating hospitals. Therefore, CAHs are required to satisfy criteria designed to assure that they are located in rural areas and that there are no other hospitals or CAHs close by.

Prior to January 1, 2006, States were able to waive the distance requirement (the requirement that the facility be 35 miles from other hospitals or CAHs) by designating a facility as a necessary provider CAH. Section 405(h)(2)(B) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 changed the statute. As of January 1, 2006, States are no longer permitted to designate a facility as a necessary provider CAH, but existing necessary provider CAHs were grandfathered. The regulations at 42 CFR 485.610(d) specify limits on the ability of a grandfathered CAH to relocate and still retain its grandfathered status. The regulation permits such CAHs to relocate, so long as the CAH remains essentially the same provider and continues to ensure access to care in the same rural service area. Specifically:

> **"§485.610(d) Standard: Relocation of CAHs that have a necessary provider designation.**

A CAH that has a necessary provider designation from the State that was in effect prior to January 1, 2006, and relocates its facility after January 1, 2006, can continue to meet the location requirement of paragraph (c) of this section based on the necessary provider designation only if the relocated facility meets the requirements as specified in paragraph (d)(1) of this section.

> (1) If a necessary provider CAH relocates its facility and begins providing services in a new location, the CAH can continue to meet the location requirement of paragraph (c) of this section based on the necessary provider designation only if the CAH is in its new location--

>> (i) Serves at least 75 percent of the same service area that it served prior to its relocation;

Exhibit 5 - 000026

      (ii) Provides at least 75 percent of the same services that it provided prior to the relocation; and

      (iii) Is staffed by 75 percent of the same staff (including medical staff, contracted staff, and employees) that were on staff at the original location.

(2  If a CAH that has been designated as a necessary provider by the State begins providing services at another location after January 1, 2006, and does not meet the requirements in paragraph (d)(1) of this section, the action will be considered a cessation of business as described in §489.52(b)(3)."

Apply the guidance below in determining whether the regulatory requirements have been met.

## General Considerations in Any Relocation

- <u>Burden of Proof</u>:  The CAH bears the burden of proof in demonstrating that its relocation satisfies the regulatory standards.

- <u>Basis for Necessary Provider Designation</u>:  As explained when the regulation at 42 CFR 610(d) was first published, the CAH is expected to continue to provide services based on the criteria that the State used when initially determining that the CAH was a necessary provider.  For example, if the determination was based on the CAH being located in a health professional shortage area (HPSA), then the relocated CAH must continue to be located in a HPSA.  (See 70 FR 23453 and 70 FR 47472.)  The CAH bears the burden of providing documentation from the State indicating what the original basis of the State's necessary provider determination was, and that the relocation will not have any impact on continued conformity of the CAH to the original decision criteria.

- <u>Renovation or Expansion</u>:  Renovation or expansion of a CAH's existing building or addition of building(s) on the existing main campus of the CAH is not considered a relocation (unless a CAH previously undertook a relocation without receiving the necessary RO approval).  There is no change to its CAH designation and, therefore, no need for the RO to make any determination on its continued CAH designation.

- <u>All New Facilities</u>:  All newly constructed necessary provider CAH facilities are considered relocated facilities.  This includes construction of a new facility that replaces the existing CAH main campus, even when on the same site as the original building.  (See 70 FR 47472.) (See discussion at 70 FR 47472.)

- <u>Relocation Without Necessary Provider Designation</u>:  If a CAH relocates and meets, at the new location, all of the CoPs found at 42 CFR 485 Subpart F (including location in a rural area as required at §485.610(b) and distance from other hospitals or CAHs as required at §485.610(c)), it will qualify for CAH

Exhibit 5 - 000027

designation in the same way as would a new CAH. However, if it wishes to retain its grandfathered necessary provider status, then it must also satisfy the requirements at §485.610(d).

- <u>75 Percent Criteria</u>:  The relocated CAH must meet <u>each</u> of the three 75 percent criteria found at 42 CFR 485.610(d) (and explained below) in order to maintain its grandfathered necessary provider designation after relocation.  We expect that CAHs will demonstrate in advance of their relocation the likelihood that they will satisfy the criteria.  The discussion below focuses on the evaluation of this prospective data. After the relocation is completed, the CAH must submit evidence confirming that it satisfied the criteria.

Listed below are examples of methods necessary provider-designated CAHs could use to meet each of the 75 percent criteria at 42 CFR 485.610(d) (1).  The CAHs are free to submit documentation employing different methodologies for each criterion, indicating how they think both the methodology and supporting evidence document comply with the regulatory requirements.  The RO will determine whether the methodology employed is supported by the evidence and if the CAH has met the burden of proof necessary to satisfy the regulation.  The same methodology should be used by the CAH for both the pre-relocation attestation and the confirmation after relocation is completed.

**Relocation Serves 75 Percent of the Same Service Area**

The CAH must present documentation showing why the Service Area projected for the relocated CAH will include at least 75 percent of its original service area.

In the absence of special factors that indicate the need for an alternative methodology, in order to meet the statutory and regulatory intent of this provision, CMS will compare the zip code location of populations currently served by the CAH with the populations in the zip codes served by the CAH in its new or proposed new location.  Examples of special factors are: (a) Statistical anomalies that may occur when each of one or more zip codes contains less than 5 percent of the total number of individuals served by the CAH, or (b) The presence of major demographic or geographical differences between the old and new location (such as an un-bridged river separating the two locations).

Example of adequate documentation:

Assume that the CAH identifies the zip codes of its patients from the past year, ranked from highest to lowest volume of patients per zip code, and found that it served 200 patients from the following zip codes:

| Zip Code | Current Patients | Patients in New Location | | |
| --- | --- | --- | --- | --- |
| | | Example # 1 | Example #2 | Example #3 |
| Zip code A ………… 80 patients …… | | 70 …… | 70 ……… | 80 |
| Zip code B………… 30 patients…… | | 26… | 26 … | 30 |
| Zip code C………… 29 patients…… | | 9…… | 9… | 29 |
| Zip code D………… 28 patients … | | 15… | 15 | 28 |

Exhibit 5 - 000028

| | | | | |
|---|---|---|---|---|
| Zip code E………….. 24 patients…… | | 0…… | 24 … | 24 |
| Zip code F…………... 9 patients  (4.5%) | | 30… | 0 (Dropped #2) | 9 |
| **Subtotal (Ex. #1)…** | **200** | **150 (75%)** | **144** | |
| Subtotal (Ex. #2) … | 191 | | 144 (75% of 191) | |
| **Subtotal (Ex. #3)** | **200** | | | |
| Zip code G | 20 | 26 | 40 | |
| Zip code H | 30 | 30 | 60 | |
| GRAND TOTAL  200 | | 200 | 200 | 300 |

In example #2, zip code "F" has been dropped at the CAH's request because its percent of the current service area is less than 5 percent.

In example #3, the CAH meets the 75 percent requirement.  Even though the number of people served from the original location is only 67 percent of the total to be served in the new location (200/300), 100% of the volume from the zip codes served in the original location will be served in the new location (200/200). The regulation focuses on whether the people in the original location will continue to be served, not whether the CAH services are being expanded.

After the CAH has been in operation at the new location for a reasonable period of time (e.g., 6 months to 1 year), the CAH must submit evidence to confirm that the 75 percent requirement is met as a matter of fact rather than projection.

CMS may lessen the amount of supporting information required in some cases where the circumstances and extent of relocation are very simple.  For example, if the CAH documents that the new facility is being built on or adjacent to the current facility's campus, then it would be reasonable for the CAH to argue that the relocated CAH by virtue of its very close proximity to the original CAH could be assumed to serve the same community.  For almost all other cases, more evidence will be required.  Depending on the characteristics of the community served by the CAH and the availability of other CAHs or hospitals in the region, it is possible that relocations of even a few miles might significantly change the CAH's service area.

**Seventy-five Percent of the Same Services**

In order to meet the "75 percent of the same services standard," the CAH must demonstrate that at least 75 percent of the total service lines provided by the CAH at its original location will continue to be offered at its new location, under generally similar terms.

The same services standard under 42 CFR 485.610(d)(ii) does not preclude the CAH from adding additional, new services at the new location.  It merely states that the CAH must retain 75 percent of the original services offered at its original location prior to relocation.

Exhibit 5 - 000029

CMS examines two dimensions to the "same services" requirement:

- The services lines themselves (e.g., lines of business such as obstetrics), in which we compare the number of such lines retained after relocation compared to the pre-relocation service array; and

- The scope and availability of such services, in which we seek to understand if there are to be any significant reductions in the new location compared to the pre-location services.

There are a variety of ways in which health care services can be categorized. The regulation does not prescribe a particular service classification taxonomy. However, the CAH must present a breakdown of its services that is sufficiently detailed to enable a pre- and post-relocation analysis. For example, a listing that consisted only of "inpatient" and "outpatient" services would be too general to permit meaningful analysis. It would be acceptable for a CAH to use the service categories found in the American Hospital Association annual hospital survey data, but the CAH can also submit an alternative list of services. In the latter case, the RO will determine whether there is sufficient information about the services to make a determination of regulatory compliance. Whatever service classification system the CAH uses to describe the services offered prior to relocation must also be used for the services after relocation.

**Example 1:**

- The CAH originally offered 14 services:

| Outpatient | Inpatient |
|---|---|
| Emergency department | General medical/surgical services |
| Primary care | Pediatric medical/surgical services |
| Pre- & postnatal care | General obstetrics/gynecology |
| Outpatient surgery | Orthopedics |
| Counseling services | Distinct Part Unit – Psychiatric* |
| Well-baby clinic | |
| Pediatric outpatient services | |
| Ultrasound | |
| Mammography | |

- After relocation the CAH attests that it will retain 12 of those services

**Retained:**

| Outpatient | Inpatient |
|---|---|
| Emergency department | General medical/surgical services |
| Primary care | |

Exhibit 5 - 000030

| | |
|---|---|
| Pre & postnatal care | General obstetrics/gynecology |
| Outpatient Surgery | Orthopedics |
| Well-baby clinic | |
| Pediatric outpatient services | |
| Counseling services | |
| Ultrasound | |
| Mammography | |

**Eliminated:**

| Outpatient | Inpatient |
|---|---|
| | Pediatric medical/surgical services |
| | Distinct Part Unit – Psychiatric* |

- The CAH also proposes to add 7 services:

**Added:**

| Outpatient | Inpatient |
|---|---|
| MRI | |
| CT Scanner | |
| Dietician | |
| Physical rehabilitation | Distinct Part Unit – Rehabilitation* |
| Chemotherapy | Oncology |

- Additionally, the retained services are planned and actually are generally available under the same terms, e.g., the number of inpatient beds or service hours for outpatient clinics are generally the same, etc. In this scenario the CAH demonstrates it will retain over 85 percent of its original services, exceeding the 75 percent regulatory requirement.

  *NOTE: Although CAH distinct part units are subject to <u>hospital</u> rather than <u>CAH</u> Conditions of Participation, for purposes of determining compliance with the 75 percent same services standard they must be included in the list of services.

**Example 2:**

- The CAH originally offered 20 different services. If the CAH attests it will drop 6 services, while adding 6 new and different services, it has not demonstrated it will retain 75 percent of the same services and would not meet the regulatory same service requirement.

Regardless of the number of original services, if the CAH attests it will retain a service, but make it available only 20 percent of the time that it was available at the original location, then that is not the same service. If it is available 50 percent or more of the time

Exhibit 5 - 000031

than it was available at the original location, then that service can count toward its 75 percent of the same services compliance.

In its attestation the CAH should list all the services offered at the CAH at its original location at the time of the attestation, including an indication of the quantity or hours the outpatient services are available. It should also list the services and their availability planned for the new location.

After the relocation is complete, the CAH must submit confirming evidence that it meets the 75 percent same services standard. The CAH should provide the list of its actual services and their availability.

**Seventy five percent of the Same Staff (including medical staff, contracted staff, and direct employees):**

In order to meet the "75 percent of the same staff" standard, the CAH must demonstrate that 75 percent of the CAH's staff that were at the CAH prior to relocation remains on staff after the relocation takes place. This includes contracted personnel. For purposes of this requirement, contracted staff includes all personnel who regularly work onsite at the CAH, whether they are directly contracted by the CAH or whether they are employees of a contractor. At the CAH's option, the CAH may exclude from these calculations all contracted employees who work less than halftime on average (or any lesser threshold of time the CAH elects (such as 10 hours per week on average). However, the CAH must consistently apply such a threshold in all calculations.

It is not necessary to calculate the 75 percent for each of the 3 types of staff – medical, contracted, and direct employees – separately. For example, a CAH could retain 50 percent of its medical staff, 40 percent of its contracted staff, but 80 percent of its direct employees, and meet the regulatory standard, so long as the retention rate for these 3 groups combined is 75 percent.

In its attestation, the CAH should provide a list of all staff at the time of the attestation. It must demonstrate how it plans to retain at least 75 percent of its current staff. Staff who are working on a J-1 Visa Waiver Program, National Health Service Corps Federal Loan Repayment Program, or National Health Service Corps State Loan Repayment Program and whose service limits under the terms of those programs will have expired at the time of relocation should not be included when comparing the staff at the old and new locations.

Examples of how a CAH could demonstrate in its attestation that it will meet the 75 percent of the same staff criteria include:

- Attestation from staff that they expect to continue their current employment or contractual relationship with the CAH at the new location; or

- Evidence demonstrating how staff commutes to the CAH would not change significantly from the original location to the new location for at least 75 percent

Exhibit 5 - 000032

of staff; or

- Evidence of employment arrangements/contracts continuing with at least 75 percent of the same staff.

Those CAHs that have difficulty meeting the 75 percent same staff criterion due to historically high staff turnover and/or vacancy rates, can provide additional documentation explaining the effect of such factors on their ability to satisfy the standard, and whether they could meet the standard if the original staff list is adjusted to reflect historical turnover. The CAH must provide evidence, however, that it is actively attempting to recruit replacements for the same type of staff as those who have left. The documentation must provide evidence that circumstances beyond the CAH's control rather than the relocation of the CAH accounts for the expected greater than 25 percent change in the staff roster. It might not be reasonable to expect a CAH to meet the 75 percent same staff standard if it can provide sufficient evidence that it has, for example, a 25 percent historic rate of staff turnover. In addition, to documenting an historically high turnover rate the CAH should also provide documentation of efforts it is making to reduce turnover, such as evidence of active recruitment efforts, i.e., posting of vacancies, participating in job fairs, and evidence of outreach to professional schools and universities. The CAHs might also indicate whether they believe relocation will benefit the facility by decreasing the staff turnover rate, including evidence to support this assumption.

**Letter of Attestation**

Prior to the relocation of a CAH with a necessary provider designation, the CAH should submit a letter of intent to the RO. The CAH would be well-advised to send the letter early in the planning stage of its relocation, prior to spending or obligating significant funds and resources. The letter should state that the CAH plans to relocate, i.e., that it plans to build a new replacement facility, and must attest that it will continue to be essentially the same provider serving the same service area, but in a new facility. It is recommended that the CAH administration contact CMS RO Survey and Certification staff prior to preparing the letter of attestation, in order to facilitate communications about the standards that a relocated CAH with a necessary provider designation must meet.

To facilitate efficient review by the RO, the Letter of Attestation should include:

- A copy of the CAH's original necessary provider determination from its State Office of Rural Health;

- Documentation from the State of how the CAH at the relocation site will continue to satisfy the criteria used by the State in the original necessary provider determination;

- Addresses of both the present location and the future location;

- Documentation that demonstrates how the new facility/location meets the rural location requirement at §485.610(b);

Exhibit 5 - 000033

- Documentation showing how the CAH will continue to be essentially the same provider at the new facility/location, in accordance with 485.610(d); and

- Timetable for the relocation.

The RO will evaluate the letter of attestation and documentation provided by the CAH to determine if the planned relocation appears likely to meet the requirements under §485.610. The RO will advise the CAH in writing of any additional information that may be needed. The RO will assess the information provided in the attestation letter and notify the CAH of its <u>preliminary determination</u>. The RO will provide preliminary approval of the relocation if the information provided by the applicant demonstrates that the proposed relocation complies with the regulatory standards at 42 CFR 485.610(b) and (d). A final determination can only be made after the relocation is completed.

**Implementation Phase**

During the implementation phase, the CAH should notify the RO of any changes to the information submitted in its letter of attestation. The purpose is for the RO to be kept apprised of any changes so that the CAH can be informed if the changes do not comply with the requirements at §485.610(b) and (d).

After the relocation is completed, if the RO determines the CAH meets all of the following criteria:

- Received a preliminary approval for its relocation from the RO;

- No changes have occurred that materially affect its preliminary attestation;

- Holds any required State license at the new location;

- Meets all CoP requirements as determined by an accreditation or SA survey; and

- Submits confirming evidence of compliance with the 75 percent criteria (in the case of same service area criterion, as noted below, the submission of this evidence will need to be submitted at a later point in time as the CAH must see patients to conclusively show compliance with the same service area requirement, but this should not delay continuation of the provider agreement at the new location upon satisfaction of all the other listed criteria);

<u>then</u> the RO makes a final determination that the relocated necessary provider CAH will be permitted to continue Medicare participation under its original provider agreement as a necessary provider CAH.

If the RO determines that the relocated necessary provider CAH does not satisfy the regulatory requirements under §485.610(b) and (d), the CAH will be considered to have

Exhibit 5 - 000034

ceased business in accordance with §489.52(b)(3) as of the date that it relocated. The RO will take action to terminate the CAH's provider agreement.

## 2256G - Co-Location of Critical Access Hospital

**(Rev. 49, Issued: 06-12-09, Effective/Implementation:  06-12-09)**

It is never permissible for a CAH that is not designated as a necessary provider to be co-located with another hospital or CAH because of distance requirements it is required to meet at 42 CFR 485.610(c). However, since States had the ability, up until January 1, 2006, to waive the minimum distance from other hospitals or CAHs requirement for CAHs designated as necessary providers, it was technically possible for a necessary provider CAH (NPCAH) to be co-located with another hospital or CAH, i.e., share the same building or campus as the other facility. Moreover, prior to the enactment of Section 405(g) of Pub. L. 108-173, which permits CAHs to operate distinct part inpatient psychiatric and/or rehabilitation distinct part units, it was understandable that a State Medicare Rural Hospital Flexibility Program (MRHFP) might have allowed co-location of a CAH with a necessary provider designation with the specialized services of a psychiatric and/or a rehabilitation hospital.

However, as of January 1, 2008, CAHs with a necessary provider designation can no longer enter into co-location arrangements with another CAH and/or hospital (72 FR 66878). Necessary provider CAHs that had co-location arrangements in effect prior to January 1, 2008, may continue these arrangements, as long as the type and scope of services offered by the facility co-located with the CAH do not change. An example of a change in type of services would be when a hospital that provides only rehabilitation services chooses to provide general hospital acute care services. An example of a change in scope of services would be when a grandfathered necessary provider CAH is currently co-located with a 20-bed psychiatric hospital and the psychiatric hospital decides to increase the number of beds to 30.

A change of ownership of a CAH participating in a grandfathered co-location arrangement will not be considered to create a new, and therefore prohibited, co-location arrangement, if, and only if, assignment of the existing provider agreement is accepted by the new owner. In all cases where there is a change of ownership of a grandfathered necessary provider CAH and the new owner does not accept assignment of the provider agreement, both the CAH's provider agreement and necessary provider designation are terminated as part of the former owner's provider agreement. If a grandfathered necessary provider CAH's provider agreement is terminated, and the facility seeks a new CAH designation, it would be required to meet all CAH requirements, including the minimum distance from other hospitals or CAHs. It would also be prohibited from entering into any co-location arrangement with a hospital or another CAH.

A change of ownership by a hospital that is co-located with a necessary provider CAH does not affect the grandfathered co-location arrangement, regardless of whether the hospital's provider agreement is assumed by the new owner or not.

Exhibit 5 - 000035

**Termination for Noncompliance**

Compliance with the co-location requirements of §485.610(e)(1) is determined by the RO. A CAH found out of compliance with the requirement is subject to termination of its Medicare provider agreement under §489.53(a)(3). In such cases the CAH is placed on a 90-day termination track, as outlined in §3012 of the SOM. During this period, the CAH will have the opportunity to come back into compliance and meet all conditions of participation (CoPs). If the CAH corrects the noncompliance situation, by terminating the co-location arrangement that led to the non-compliance during this 90-day period, then the provider agreement is not terminated.

A facility facing termination of its CAH designation as a result of non-compliance with §485.610(e)(1) could also continue to participate in Medicare by converting to a hospital, assuming that the facility satisfies all requirements for participation as a hospital in the Medicare program under the provisions at 42 CFR Part 482. Under this scenario, the CAH would apply to convert back to a hospital and be assigned a new CMS Certification Number (CCN) accordingly.

## 2256H – Off-Campus CAH Facilities
**(Rev. 143, Issued: 07-31-15, Effective: 07-31-15, Implementation: 07-31-15)**

Section 42 CFR 485.610(e)(2) requires that if a CAH operates an off-campus provider-based facility as defined in §413.65(a)(2) (except for a rural health clinic (RHC)) or off-campus rehabilitation or psychiatric distinct part unit as defined in §485.647, that was created or acquired on or after January 1, 2008, then the off-campus facility must meet the requirement at 42 CFR 485.610(c) to be more than a 35 mile drive (or a 15 mile drive in the case of mountainous terrain or an area with only secondary roads) from another hospital or CAH. Off-campus CAH facilities that were in existence prior to January 1, 2008, are not subject to this requirement. The drive to another hospital or CAH is calculated from the off-campus facility's location to the main campus of the other hospital or CAH.

If a non-IHS or non-Tribal CAH operates an off-campus provider-based facility, its proximity to an IHS or Tribal CAH or hospital is not considered when determining compliance with these requirements. Similarly, if an IHS or Tribal CAH operates an off-campus provider-based facility, its proximity to a non-IHS or non-Tribal CAH or hospital is not considered when determining compliance.

Definitions related to provider-based status are found at 42 CFR 413.65(a)(2):
   "**Campus:** means the physical area immediately adjacent to the provider's main buildings, other areas and structures that are not strictly contiguous to the main buildings, but are located within 250 yards of the main buildings, and any other areas determined on an individual case basis, by the CMS regional office, to be part of the provider's campus."

   "**Department of a provider:** means a facility or organization that is either created by, or acquired by, a main provider for the purpose of furnishing health care services of

Exhibit 5 - 000036

the same type as those furnished by the main provider under the name, ownership, and financial and administrative control of the main provider, in accordance with the provisions of this section. A department of a provider comprises both the specific physical facility that serves as the site of services of a type for which payment could be claimed under the Medicare or Medicaid program, and the personnel and equipment needed to deliver the services at that facility. A department of a provider may not itself be qualified to participate in Medicare as a provider under §489.2 of this chapter, and the Medicare conditions of participation do not apply to a department as an independent entity. For purposes of this part, the term 'department of a provider' does not include an RHC or, except as specified in paragraph (n) of this section, an FQHC."

**"Remote location of a hospital:** means a facility or organization that is either created by, or acquired by, a hospital that is the main provider for the purpose of furnishing inpatient hospital services under the name, ownership, and financial and administrative control of the main provider, in accordance with the provisions of this section. A remote location of a hospital comprises both the specific physical facility that serves as the site of services for which separate payment could be claimed under the Medicare or Medicaid program, and the personnel and equipment needed to deliver the services at that facility. The Medicare conditions of participation do not apply to a remote location of a hospital as an independent entity. For purposes of this part, the term "remote location of a hospital" does not include a satellite facility as defined in §412.22(h)(1) and §412.25(e)(1) of this chapter."

**"Provider-based entity**: means a provider of health care services, or a RHC as defined in §405.2401(b) of this chapter, that is either created or acquired by the main provider for the purpose of furnishing health care services of a different type from those of the main provider under which the ownership and administrative and financial control of the main provider, in accordance with the provisions of this section. A provider-based entity comprises both the specific physical facility that serves as the site of services of a type for which payment could be claimed under the Medicare or Medicaid program, and the personnel and equipment needed to deliver the services at the facility. A provider-based entity may, by itself, be qualified to participate as a provider under §489.2, and the Medicare conditions of participation do apply to a provider-based entity as an independent entity."

**"Provider-based status**: means the relationship between a main provider and a provider-based entity or a department of a provider, remote location of a hospital, or a satellite facility, that complies with the provisions of this section."

The CAH off-campus location regulations at §485.610(e)(2) apply to off-campus distinct part units, as defined at §485.647, to departments that are off-campus, to remote locations of CAHs, as defined at §413.65(a)(2), and, on or after October 1, 2010, to off-campus facilities that furnish only clinical diagnostic laboratory tests operating as parts of CAHs. The requirements apply, regardless of whether the CAH is a grandfathered necessary provider CAH or not. However, the regulations also specifically state that they do not apply to RHCs that are provider-based to a CAH.

Exhibit 5 - 000037

These regulations also do not apply to the following types of facilities/services owned and operated by a CAH, because such facilities or services generally are not eligible for provider-based status, in accordance with §413.65(a)(1)(ii):

- Ambulatory surgical centers (ASCs);

- Comprehensive outpatient rehabilitation facilities (CORFs);

- Home Health Agencies (HHAs);

- Skilled nursing facilities (SNFs);

- Hospices;

- Independent diagnostic testing facilities furnishing only services paid under a fee schedule, such as facilities that furnish only screening mammography services, facilities that furnish only clinical diagnostic laboratory tests, other than those operating as parts of a CAH, or facilities that furnish only some combination of these services.

- ESRD facilities;

- Departments of providers that perform functions necessary for the successful operation of the CAH, but for which separate CAH payment may not be claimed under Medicare or Medicaid, e.g., laundry, or medical records department; and

- Ambulances.

In the case of Federally Qualified Health Centers (FQHCs), although CMS rules permit them to be provider-based departments of a hospital or CAH, it is unlikely that there are new FQHCs that meet the provider-based criteria, since Health Resources and Services Administration (HRSA) requirements for separate FQHC governance make it unlikely an FQHC could meet provider-based governance requirements. However, there are grandfathered FQHCs that were in operation prior to April 7, 2000, which are permitted to retain their provider-based status.

Provider-based determinations are site-specific and based on the facility's location with respect to the main campus when the attestation is made to the RO. If a CAH relocates an off-campus facility, including off-campus facilities that were in existence or under development prior to January 1, 2008, and are currently grandfathered, the off-campus facility must comply with the requirements at §485.610(e)(2) and the provider-based rules at §413.65. The CAH will resubmit an attestation to the RO for the new location to determine if it meets all the requirements at the new location.

In addition, if the main campus of the CAH relocates, it may wish to obtain a provider-based determination for all of its off-campus locations. However, this is a voluntary decision on the part of the CAH. There is no need for a new determination of compliance

Exhibit 5 - 000038

with the CAH location requirements at §485.610(e)(2) when there is no change of location of the off-campus facilities. If the CAH seeks a provider-based determination, the RO conducts the review in the same manner as described below.

**Process Requirements**

Under the general provider-based rules at §413.65, hospitals and CAHs are not required to seek an advance determination from CMS that their provider-based locations meet the provider-based requirements, but many choose to do so rather than risk the consequences of having erroneously claimed provider-based status for a facility. However, §485.610(e)(2) provides that a CAH can continue to meet the location requirement at §485.610(c) only if the off-campus provider-based location or off-campus distinct part unit is located more than a 35 mile drive (or 15 mile drive in the case of mountainous terrain or in areas where only secondary roads are available) from a hospital or another CAH. Therefore, a CAH must seek an advance determination of compliance with the location requirements for any off-campus provider-based facility established on or after January 1, 2008.

A facility that seeks such a determination must submit an attestation to the RO documenting how the facility complies with the CAH provider-based location requirements at §485.610(e)(2).

The RO survey and certification staff reviews the attestation for evidence that the CAH's off-campus facility is more than a 35 mile drive (or 15 miles in the case of mountainous terrain or an area with only secondary roads) from another hospital or CAH. The RO utilizes the same process employed for assessing the compliance of a CAH applicant's main campus with the minimum distance criteria.

The CAH must also review and comply with all applicable requirements at 42 CFR 413.65. If the CAH voluntarily seeks a determination that it meets the requirements of §413.65, the RO financial management staff reviews the CAH's attestation for completeness and consistency with the provider-based rules. For purposes of this review, CMS considers issues such as the following. This list is provided for informational purposes only; it is not all-inclusive.

- The off-site facility must operate under the same license of the main provider, except in areas where the State requires a separate license for facilities that Medicare would treat as the department of the provider or in areas where State law does not address licensure.

- The clinical services of the off-site facility and the CAH main provider are fully integrated as evidenced by:

  - Professional staff have clinical privileges at the main provider;

  - The main provider maintains the same monitoring and oversight of the off-campus facility as it does for any other department of the provider;

Exhibit 5 - 000039

- The medical director or other similar official of the off-campus facility maintains a reporting relationship with the chief medical officer or other similar official of the main provider and is under the same type of supervision and accountability, and reporting as any other director, medical or otherwise of the main provider;

- Medical staff committees or other professional committees at the main provider are responsible for medical activities in the off-campus facility and the main provider. This includes quality assurance, utilization review, and the coordination and integration of services, to the extent practical, between the off-campus facility and the main provider;

- Medical records for patients treated in the off-campus facility are integrated into a unified retrieval system (or cross-referenced) of the main provider; and

- Inpatient and outpatient services of the off-campus facility and the main provider are integrated, and patients treated at the off-campus facility who require further care have full access to all services of the main provider and are referred where appropriate to the corresponding inpatient or outpatient department of the main provider.

- The financial operations of the off-campus facility are fully integrated within the financial system of the main provider;

- The off-campus facility is held out to the public as part of the main provider. When patients enter the off-campus facility, they are made aware they are entering the main provider and will be billed accordingly;

- The off-campus facility is operated under the ownership (100 percent) and control of the main provider;

- The reporting relationship between the off-campus facility and the main provider must have the same frequency, intensity, and level of accountability that exists between the main provider and one of its existing departments;
- The off-campus facility is located within a 35 mile radius of the main provider. This distance is measured in radial miles or a straight line measurement between the main provider and the provider-based department, remote location, and/or distinct part unit;

- Off-campus outpatient departments must also comply with the following:

  - Physician services furnished in a department of the CAH must be billed with the correct site of service so that appropriate physician and practitioner payment amounts can be made;

Exhibit 5 - 000040

- CAH outpatient departments must comply with all of the terms of the CAH's provider agreement, including the CAH Conditions of Participation at 42 CFR Part 485, Subpart F;

- Physicians working in departments of the main provider are obligated to comply with the non-discrimination provisions in §489.10(b);

- CAH outpatient departments must treat all Medicare patients, for billing purposes, as CAH outpatients; and

- When Medicare beneficiaries are treated in CAH outpatient departments that are located off-campus, the treatment is not required to be provided by the anti-dumping rules in §489.2, unless the off-campus facility meets the EMTALA definition of a dedicated emergency department found at 42 CFR 489.24(b).

**Termination for Noncompliance**

A CAH found out of compliance with the off-campus location requirements at §485.610(e)(2) is subject to termination of its Medicare provider agreement. In such cases the CAH is placed on a 90-day termination track, as outlined in §3012. If the CAH corrects the situation, by terminating during this 90 day period the off-campus provider-based arrangement that led to the non-compliance, then the provider agreement is not terminated.

A facility facing termination of its CAH status as a result of non-compliance with §485.610(e)(2) could also continue to participate in Medicare by converting to a hospital, assuming that the facility satisfies all requirements for participation as a hospital in the Medicare program under the provisions at 42 CFR Part 482. Under this scenario, the CAH would apply to convert back to a hospital with the effective date coinciding with the date of termination of CAH status. A new CCN number would be assigned accordingly.

Beginning October 1, 2010, off-campus CAH-owned clinical diagnostic laboratory facilities that do not satisfy the requirements to be provider-based to a CAH, including applicable distance requirements, may continue to participate separately in Medicare as a clinical diagnostic laboratory, but will no longer be considered to be part of the certified CAH.

# 2257 - CAH Anti-Dumping Requirements

**(Rev. 1, 05-21-04)**

Medicare participating hospitals must meet the requirements in §1867 of the Act, "Examination and Treatment for Emergency Medical Conditions and Women in Labor," and the applicable provisions of §1866 of the Act. The regulatory requirements are found in 42 CFR 489.24 and 489.20(l),(m),(q) and (r). For purposes of the anti-dumping requirements the term "hospital" includes CAHS. The provisions of §1867 apply to all

Exhibit 5 - 000041

individuals (not just Medicare beneficiaries) who attempt to gain access to a hospital or a CAH for emergency care. The SA will investigate any alleged violation by a CAH according to the procedures found in the SOM.

## 2258 - Advance Directive Requirements for CAHS

**(Rev. 1, 05-21-04)**

The requirements at 42 CFR 489.100, 489.102, and 489.104, apply advance directive requirements to CAH inpatients, including inpatients receiving SNF level of care in swing-beds. When the SA is conducting a CAH survey, apply the advance directive requirement to all CAH inpatients.

## 2259 - Procedures for Processing CAH Swing-Bed Applications

**(Rev. 1, 05-21-04)**

A facility that has been designated as a CAH by the State and certified as a CAH by CMS may apply at any time to participate in the swing-bed program. Application is made using a letter on the provider's letterhead requesting participating for swing-beds. Only CMS can approve an application to participate in the Medicare swing-bed program.

## 2259A - Definition, Authority and Requirements for CAH Providers of Extended Care Services ("Swing-Beds")

**(Rev. 1, 05-21-04)**

"Swing-bed" is a reimbursement term that means the care and reimbursement for the care of a patient in a small rural hospital or CAH "swings" from acute care to post hospital skilled nursing care (SNF). A swing-bed hospital means a hospital or CAH participating in Medicare that has an approval from CMS to provide post hospital SNF care and meets the requirements specified in 482.66 for a hospital or 485.645 for a CAH.

Certification to provide swing-beds is an approval separate from the certification to operate as a hospital or CAH. When a survey of swing-beds is completed, any deficiencies and Plans of Correction (PoC) must be documented on a separate Form CMS-2567. If the swing-beds are voluntary terminated or terminated by CMS, that action does not affect the continuing operation of the provider as a hospital or CAH. It terminates the approval to operate and receive reimbursement for the swing-beds.

The swing-beds in a hospital or CAH do not have to be separated from the acute patients although the facility may choose to do so. The patients do not have to move to a different location in the facility when changing from acute care status to swing-bed status unless the facility requires it.

There is no length of stay restriction for a swing-bed patient whether they are in a hospital or a CAH. There is no required discharge to a nursing home and no transfer agreement.

Exhibit 5 - 000042

Patients may be discharged to a nursing home as part of discharge planning, but it is not required.

A medical order in the chart by the physician is required to change status from acute care to swing-bed because the patient is being discharge from acute care status and admitted to swing-bed status. This is necessary for reimbursement purposes because the billing and reimbursement change or "swing." Accordingly, the facility is given a sub-provider number for billing swing-bed services.

For Medicare patients, a 3-day qualifying stay in any hospital or CAH is required to prior to admission to a swing-bed and the admission must be for treatment of the same condition. This 3-day qualifying stay only applies to a Medicare patient.

**NOTE:** The 30-day patient transfer notice requirement at 42 CFR Part 483.12(a)(5) does not apply to swing-bed CAHS.

## 2259B - Request from a Medicare Participating CAH to add Swing-bed Approval

**(Rev. 1, 05-21-04)**

The request can be initiated on the provider's letterhead stationery and sent to the SA. Acknowledgement and request for further information can be sent from the SA to the provider in a letter.

## 2259C - Pre-Survey Activity

**(Rev. 1, 05-21-04)**

Prior to scheduling a survey, the SA reviews the provider file as well as any other information maintained on the CAH. If the CAH requirements are met and the CAH has begun to provide swing-bed services, the SA schedules a survey. No CAH may receive initial swing-bed approval without an onsite survey of the actual provision of such services. The SA may send a letter to the provider notifying them of a future survey. Prior to survey the SA verifies that the hospital has a valid Medicare provider agreement.

## 2259D - Certificate Of Need (CON) Approval

**(Rev. 1, 05-21-04)**

States that have a CON requirement for the initiation or expansion of long-term care services may require a CON for a limited number of beds for LTC use. There is no federal requirement for a CON but CMS will not intervene if there is a state requirement.

## 2260 - Survey Procedures for Swing-Bed Approval

**(Rev. 1, 05-21-04)**

Exhibit 5 - 000043

The SA surveys any CAH that meets CAH requirements and that has begun to provide post-hospital SNF and NF care services. The SA may choose to use the optional Swing-Bed Survey Report that can be found with Appendix W to record survey findings.

The survey for swing-bed approval may be conducted at the same time as a survey of the CAH CoP at 42 CFR Part 485, although the findings must be documented on a separate Form CMS-2567.

## 2261 - Post-Survey Procedures for Swing-Bed CAHS

**(Rev. 1, 05-21-04)**

To receive swing-bed approval, a CAH must be found in compliance with the provisions of 42 CFR Part 485.645 and the specific skilled nursing requirements in 42 CFR 483 that apply to swing-bed CAHS, see Appendix W. If a plan of correction is required following the survey, send a copy of Exhibit 151, "Request for a Plan of Correction Following an Initial CAH Survey," to the provider.

Effective dates for all swing-bed approvals are based on the provisions at 42 CFR 489.13 that state the agreements will be effective on the date the onsite survey is completed if all Federal requirements are met on the date of the survey. If the provider fails to meet any of the requirements, the approval will be effective on the earlier of the following dates:

- The date on which the prospective CAH meets all requirements; or

- The date the prospective CAH submits a correction plan acceptable to CMS.

## 2262 - RO Approval Procedures for Swing-Bed Approval

**(Rev. 1, 05-21-04)**

The RO prepares a formal determination and notifies the CAH of its approval or denial. For approvals, see Exhibit 150B, "Approval Notification for Swing-beds in a Hospital," or denials, see Exhibit 149, "CAH Denial for Medicare Participation."

If the provider is found to be in non-compliance after they have started to provide swing-bed services, a termination of the approval can be accomplished through a termination letter, see Exhibit 152, "CAH Termination Letter." Failure to satisfy requirements for swing-bed approval does not affect Medicare approval as a provider of hospital services, but it does withdraw the approval to provide SNF level services at the CAH.

Exhibit 5 - 000044

Exhibit 5 - 000045

## Transmittals Issued for this Chapter

| Rev # | Issue Date | Subject | Impl Date | CR# |
|-------|-----------|---------|-----------|-----|
| R164SOM | 11/04/2016 | Revisions to the State Operations Manual (SOM) Chapter 2 | 11/04/2016 | N/A |
| R154SOM | 06/10/2016 | Revisions to the State Operations Manual (SOM) Chapter 2 | 06/10/2016 | N/A |
| R152SOM | 03/25/2016 | Revisions to the State Operations Manual (SOM) Chapter 2 | 04/04/2016 | N/A |
| R150SOM | 10/30/2015 | Revisions to State Operations Manual (SOM), Chapter 2, Clarification of Requirements for Off-Premises Activities and Approval of Extension Locations for Providers of Outpatient Physical Therapy and Speech-Language Pathology Services | 10/30/2015 | N/A |
| R146SOM | 09/04/2015 | State Operations Manual (SOM), Section 2185- Home Health Agencies (HHAs), Change of Address to a Medical Administrative Contractor (MAC) within 90 Days | 09/04/2015 | N/A |
| R143SOM | 07/31/2015 | Revisions to State Operations Manual (SOM) Chapter 2, The Certification Process and Appendix W, Survey Protocol, Regulations and Interpretive Guidelines for Critical Access Hospitals (CAHs) and Swing-Beds in CAHs | 07/31/2015 | N/A |
| R139SOM | 04/24/2015 | Revisions to the Medicare State Operations Manual (SOM), Chapter 2, Rural Health Clinic Certification | 04/24/2015 | N/A |
| R132SOM | 01/16/2015 | New Additions to State Operating Manual (SOM), Psychiatric Residential Treatment Facilities (PRTF) Chapter 2 | 01/16/2015 | N/A |
| 125SOM | 10/31/2014 | Revisions to State Operations Manual (SOM) Chapter 2 | 10/31/2014 | N/A |
| 123SOM | 10/03/2014 | Revisions to State Operations Manual (SOM) Chapters 1, 2 and 3 | 10/03/2014 | N/A |
| R111SOM | 04/11/2014 | State Operations Manual (SOM) Chapter 2 Policy Revisions For Organ Procurement Organizations (OPOs) | 04/11/2014 | N/A |
| R91SOM | 09/27/2013 | State Operations Manual (SOM) Chapter 2 Policy and Nomenclature Revisions for Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICF/IID) | 09/27/2013 | N/A |

Exhibit 5 - 000046

| R90SOM | 08/30/2013 | State Operations Manual, Chapter 2, Section 2256A,CAH Distance Criteria | 08/30/2013 | N/A |
|---|---|---|---|---|
| R85SOM | 07/19/2013 | Federally Qualified Health Center (FQHC) Medicare Participation | 07/19/2013 | N/A |
| R83SOM | 03/15/2013 | Revisions to Appendix E and Chapter 2 sections 2290-2308 of the State Operations Manual (SOM) | 03/15/2013 | N/A |
| R82SOM | 08/01/2012 | CMS Certification Numbers for Medicaid-Only Hospitals and new State Code for Foreign Countries | 08/01/2012 | N/A |
| R73SOM | 12/02/2011 | Revisions to Chapter 2, "The Certification Process", Sections 2082-2089-"Hospices" | 12/02/2011 | N/A |
| R69SOM | 12/15/2010 | Revisions to Chapter 2, "The Certification Process", Sections 2080-2089-"Hospices," and Appendix M, "Guidance to Surveyors, Hospices" | 10/01/2010 | N/A |
| R65SOM | 10/01/2010 | Revisions to Chapter 2, "The Certification Process", Sections 2080-2089-"Hospices," and Appendix M, "Guidance to Surveyors, Hospices" - Rescinded and replaced by Transmittal 69 | 10/01/2010 | N/A |
| R62SOM | 07/30/2010 | New State Code for Missouri; New CCN for Medicaid -Only Hospitals | 01/03/2011 | 6989 |
| R57SOM | 01/29/2010 | Revised Chapter 2, "The Certification Process", Section 2256H | 01/29/2010 | N/A |
| R53SOM | 10/16/2009 | Revising Chapter 2, "The Certification Process"-Ascertaining Compliance With the Office for Civil Rights (OCR) Requirements | 10/16/2009 | N/A |
| R49SOM | 06/12/2009 | New Critical Access Hospital (CAH) Requirements Under 42 CFR 485.610(e) Related to CAH Co-location and CAH Provider-based Locations | 06/12/2009 | N/A |
| R43SOM | 05/01/2009 | Revised Chapter 2, "The Certification Process," Section 2008A | 05/01/2009 | N/A |
| R40SOM | 03/20/2009 | Revisions to Chapter 2, "The Certification Process", Sections Relating to Federally Qualified Health Centers, and Exhibits 177 and 179 | 03/20/2009 | N/A |
| R33SOM | 03/21/2008 | Update to Chapter 2, "The Certification Process" Sections 2021 and 2022 | 03/21/2008 | N/A |

Exhibit 5 - 000047

| R32SOM | 01/18/2008 | Revisions to Chapter 2, "Critical Access Hospitals (CAHs) and Appendix W, "Survey Protocol, Regulations and Interpretive Guidelines for Critical Access Hospitals (CAHs) and Swing-Beds in CAHs" | 09/2007 | N/A |
|---|---|---|---|---|
| R29SOM | 10/12/2007 | New Number Series and State Codes for CMS Certification Numbers (formerly OSCAR Provider Numbers) | 10/01/2007 | 5490 |
| R28SOM | 09/07/2007 | Revisions to Appendix D, Guidance to Surveyors for Portable X-ray Services | 09/07/2007 | N/A |
| R25SOMA | 04/20/2007 | New Number Series and State Codes for CMS Certification Numbers (formerly OSCAR Provider Numbers) – Replaced by Transmittal 29 | 10/01/2007 | 5490 |
| R17SOMA | 01/20/2006 | Revisions to Chapter 2 The Certification Process | 01/20/2006 | N/A |
| R16SOMA | 01/10/2006 | Revisions to Chapter 2, "The Certification Process," Appendix E--"Providers of Outpatient Physical Therapy or Outpatient Speech Language Pathology (OPT/OSP) Services," and Appendix K-- "Comprehensive Outpatient Rehabilitation Facilities" | 11/21/2005 | N/A |
| R13SOM | 10/21/2005 | Revisions to Chapter 2, "The Certification Process," Appendix E-- "Providers of Outpatient Physical Therapy or Outpatient Speech Language Pathology (OPT/OSP) Services," and Appendix K-- "Comprehensive Outpatient Rehabilitation Facilities" – Replaced by Transmittal 16 | 10/21/2005 | N/A |
| R11SOM | 08/12/2005 | Revised Chapter 2--"The Certification Process," Sections 2180E thru 2200F, and Appendix B--"Interpretive Guidelines: Home Health Agencies" | 08/12/2005 | N/A |
| R06SOM | 04/29/2005 | Expansion of State Codes for OSCAR Provider Numbers | 10/03/2005 | 3844 |
| R03SOM | 10/29/2004 | Medicare Systems Acceptance of New Provider Numbers for Federally Qualified Health Centers (FQHC) | 04/04/2005 | 3537 |
| R02SOM | 08/20/2004 | Assignment of Provider Identification Numbers | N/A | 3245 |
| R01SOM | 05/21/2004 | Initial Issuance of Pub 100-07 | N/A | N/A |

Exhibit 5 - 000048